**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Patrick H. McGUIRE, Defendant–
Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**John A. MANDACINA, Defendant–
Appellant.**

**Nos. 94–1150, 94–1151.**

United States Court of Appeals,
Eighth Circuit.

Submitted June 13, 1994.

Decided Jan. 13, 1995.

Rehearing Denied Feb. 10, 1995.

Christopher Harlan, Kansas City, MO, argued (Raymond C. Conrad and Christopher C. Harlan, on the brief), for Patrick H. McGuire.

Jonathan Laurans, Kansas City, MO, argued (John P. O'Connor and Jonathan L. Laurans, on the brief), for John A. Mandacina.

Paul S. Becker, Kansas City, MO, argued (Stephen L. Hill, Jr. and Paul S. Becker, on the brief), for appellee.

Before MORRIS SHEPPARD ARNOLD, Circuit Judge, JOHN R. GIBSON, Senior Circuit Judge, and MELLOY *, Chief District Judge.

JOHN R. GIBSON, Senior Circuit Judge.

Patrick H. McGuire and John A. Mandacina appeal their convictions of conspiring to retaliate against an informant, 18 U.S.C. § 371 (1988), retaliating against an informant, 18 U.S.C. § 1513(a) (1988), using interstate commerce in the commission of the retaliation, 18 U.S.C. § 1958 (1988 & Supp. V 1993), and using a firearm in the commission of the two substantive offenses, 18 U.S.C. § 924(c) (1988 & Supp. V 1993). The charges arise from the murder of Larry Strada, a witness before the grand jury which indicted Mandacina for illegal gambling. The jury found that Mandacina agreed to pay McGuire $25,000 to murder Strada and that McGuire did so. Mandacina and McGuire both argue that the district court[1] erred in: (1) denying a motion for new trial due to *Brady* violations; and (2) denying acquittal based on insufficient evidence. Additionally, Mandacina argues that the district court erred in refusing to dismiss the indictment because the same grand jury that heard Mandacina's immunized testimony regarding gambling operations returned the indictment for the charges we now review

---

* The Honorable Michael J. Melloy, Chief United States District Judge for the Northern District of Iowa, sitting by designation.

1. The Honorable Howard F. Sachs, Senior United States District Judge for the Western District of Missouri.

and because the same prosecutor participated in both the gambling grand jury and in this prosecution. Mandacina also urges error in the district court's denial of his motion for severance and abuse of discretion in the denial of his motion for judgment of acquittal or new trial because the government's closing argument referred to the mafia, the mob, and organized crime. McGuire argues that the district court erred in admitting evidence of other grocery store and bank robberies and unrelated firearms transactions in which he had participated. We affirm the convictions.

As both McGuire and Mandacina appeal the sufficiency of the evidence, we view the evidence in the light most favorable to the government. *United States v. Long,* 952 F.2d 1520, 1524–25 (8th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 298, 121 L.Ed.2d 222 (1992). *See also Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469–70, 86 L.Ed. 680 (1942). We will discuss only the facts necessary to decide the narrow issues before us.

Larry Strada provided information to the FBI implicating Mandacina in bookmaking and other criminal activity in the Kansas City area. Mandacina later pled guilty to charges of conspiracy to conduct an illegal gambling business. On May 3, 1990, Mandacina was sentenced to twelve months imprisonment.

At approximately 2:00 a.m. on May 16, 1990, Larry Strada returned home from a bar he operated and was killed in front of his home while taking out the trash. He was shot six times in the head and twice in the chest. The gunman did not take Strada's jewelry, his wallet with approximately $200 in cash, or a bank bag with the bar's nightly receipts.

The Kansas City Area Metro Squad investigated Strada's murder for approximately one week before turning it over to the FBI and law enforcement authorities in Gladstone, Missouri. No one found a weapon, a witness, or a lead.

In mid-December 1990, McGuire and his brother-in-law Terry Dodds were arrested while committing a bank robbery in Milwau-

kee, Wisconsin. Dodds pled guilty to bank robbery and firearm charges, and received a sentence of seven years, nine months. In early 1992, Dodds decided to cooperate with the federal authorities. FBI Agent Daniel Craft interviewed Dodds regarding a number of bank robberies. During this interview, Dodds implicated Thomas Earlywine as a participant in the robberies. Dodds also stated that he had overheard a conversation in which Mandacina said that he wanted somebody killed who had fingered him for a crime.

The FBI arrested and interviewed Earlywine about the robberies and the contract killing in Kansas City. Earlywine identified the victim of the contract killing as Lonnie or Larry Strada or Strocka. Earlywine told Agent Craft that, in May of 1990, a hitman murdered Strada while Strada was taking out his trash, and that Mandacina ordered the hit for $25,000.

Earlywine testified at trial that, in November 1989, Earlywine and Dodds went to the Red Front Restaurant and Lounge in the river market area of Kansas City. Both Earlywine and Dodds described a conversation in which Mandacina told McGuire that he had been indicted on federal gambling charges and that he thought that Strada had already fingered him or was preparing to do so. Mandacina then asked if McGuire would kill Strada.

Earlywine stated that McGuire bragged previously that he would do anything for Mandacina or members of Kansas City organized crime, including "heavy work," i.e. murder. McGuire told Earlywine that he wanted to ingratiate himself with the people he believed to be in "the outfit" or mafia in Kansas City.

Earlywine also testified that on another occasion, Mandacina mentioned the gambling indictment, but told McGuire and Earlywine that he did not want to talk further at the Red Front. He suggested that they go to his brother-in-law's restaurant, "Chubby's." Once there and while in Earlywine's presence, Mandacina said that he wanted Strada murdered and that he would pay McGuire $25,000 to do it. Mandacina also asked McGuire if he would murder Mandacina's

son-in-law. McGuire said that he would and that it would be "gratis," or free.

In June 1990, McGuire met Earlywine at a bar in Rockford and told Earlywine that Strada had been murdered. McGuire said that Strada was murdered while taking out his trash and that he had deserved it. Earlywine did not ask McGuire if he killed Strada, because Earlywine believed that McGuire would have told him directly if McGuire wanted him to know.

In July 1990, Earlywine and McGuire came to Kansas City. McGuire called Frank Angotti and arranged to meet him for a drink at the Red Front. In an attempt to get Angotti to join their crime spree, McGuire told Angotti about the bank robberies in which Earlywine, Dodds and McGuire were involved and took him outside to show him a bag full of guns and a bag full of money. They then went back into the Red Front. Angotti testified to the following exchange, which occurred after Earlywine left the table:

> I told Pat [McGuire], I said, "Pat, I have been hearing rumors about you." He said, "What kind of rumors?" I said, "Well, I hear that you did Larry. Did you do Larry?" He said yes.

At trial, Dodds and Earlywine testified regarding numerous robberies involving both of them and McGuire. They also testified regarding the necessity of obtaining weapons for this purpose. While drinking in Jennie's restaurant in downtown Kansas City, Earlywine and Dodds testified that McGuire asked the bartender where he could buy more guns. The bartender introduced McGuire to a woman at the bar, Brock Decastrogiovannimausolf, whose boyfriend owned a gun shop. The next day Brock introduced McGuire to the gun shop's owner, Dennis Crouch. At first Crouch refused to sell guns to McGuire, and McGuire enlisted John Mandacina to give assurances to Crouch for the sale, which was ultimately concluded. Brock's testimony is the subject of certain *Brady* claims, and the grocery store and bank robberies are the subject of Rule 404 evidence claims. Further details will be developed as we treat those specific issues.

## I.

In November 1990, Mandacina testified under a grant of immunity before the special grand jury regarding gambling operations in Kansas City. He argues that the government used this immunized grand jury testimony to obtain the Strada indictment in 1992 and to name Peter Simone as an unindicted co-conspirator in the Strada murder.

Since Mandacina testified under a grant of immunity, 18 U.S.C. § 6002 (1988), and was later prosecuted, the government must show that any evidence used or derived has a "legitimate source wholly independent of the compelled testimony." *Kastigar v. United States*, 406 U.S. 441, 460, 92 S.Ct. 1653, 1665, 32 L.Ed.2d 212 (1972). The crucial inquiry is whether the immunized testimony was in any way *used*, not whether it was related. *United States v. McDaniel*, 482 F.2d 305, 310 (8th Cir.1973).

The testimony Mandacina gave under use immunity is extremely limited and focuses solely on Kansas City gambling. Prior to his testimony, Mandacina and fourteen others had been convicted of bookmaking and other gambling-related crimes. Mandacina was not asked questions during the gambling investigation which related to Strada or Strada's murder nor did he provide any such information spontaneously.

The government did not use Mandacina's grand jury testimony in the Strada case. The government did not refer to the immunized testimony nor derive leads from it. Special Agent Eugene Thomeczek testified that the investigation into the Strada murder was "effectively discontinued" until March 16, 1992, when he received word from Agent Craft following Earlywine's interrogation.

Mandacina argues that the government used his immunized testimony concerning Simone to link Mandacina and Simone as co-conspirators in the Strada murder. However, Simone was named as a co-conspirator based upon the statements of Dodds, not the grand jury testimony of Mandacina. Before the grand jury, Mandacina testified only that he knew Simone and that Simone operated a

poker machine in Mandacina's restaurant for a couple of weeks.

The district court held a *Kastigar* hearing and concluded that use immunity was not violated:

> Under the circumstances of this case, the court has been convincingly shown by the Government that no prejudicial misconduct occurred, either by the Assistant United States Attorney's participation in a grand jury hearing at which [Mandacina's] immunized testimony was heard, in a slightly related investigation, or by scheduling the indictment in this murder-for-hire case before the same grand jury that heard the immunized testimony. Such testimony was innocuous, and bears scarcely any relationship with the proof in the murder-for-hire case. Use immunity has been fully preserved.

*United States v. Mandacina,* No. 93–00073–01–CR–W–6 (W.D.Mo. Sept. 20, 1993) (footnote omitted).

 Section 6002, "like the Fifth Amendment, grants neither pardon nor amnesty." *Kastigar,* 406 U.S. at 461, 92 S.Ct. at 1665. Rather, section 6002 requires that the government establish an independent source for evidence related to previously immunized testimony. We must uphold the district court's findings regarding an independent source unless clearly erroneous. *United States v. Garrett,* 849 F.2d 1141, 1142 (8th Cir.1988). No error occurred because the testimony of Earlywine, Dodds and Kraft establishes an independent source.

Mandacina claims further error because the prosecuting attorney in this case previously compelled Mandacina's immunized testimony regarding gambling operations, citing *McDaniel,* 482 F.2d 305. *McDaniel* is a case limited to its "unusual circumstances." 482 F.2d at 312. The determination of a *McDaniel* violation necessarily turns on the facts of each case and again focusses on whether the immunized testimony was used by the prosecutor exposed to it. *Id.* at 311. On the facts before us, we conclude that no such violation occurred.

 In *McDaniel,* the prosecutor read three volumes of immunized testimony "in which McDaniel fully confessed his misdeeds" three and eight months, respectively, before McDaniel was handed two indictments. *Id.* at 311. At the time the prosecutor in *McDaniel* read the transcript, the prosecutor was unaware of the immunity. *Id.* McDaniel testified under a grant of immunity about the very things for which he was later indicted. In contrast, Mandacina testified about gambling operations and was later indicted on charges arising from a murder. The only substantive link between the two is motive: the government argued that Mandacina retaliated against Strada for providing information to the government which led to Mandacina's arrest and conviction on bookmaking charges. Although Mandacina testified as to details of Kansas City gambling operations not previously known by the government, those details were neither relevant to nor used in prosecuting Mandacina for Strada's murder. Much of Mandacina's testimony merely confirmed information previously obtained by the government through a court authorized wiretap. *See United States v. Burke,* 856 F.2d 1492, 1494 (11th Cir.1988) (holding that immunized testimony which merely confirms information previously known to government agents from independent sources does not preclude prosecution), *cert. denied,* 492 U.S. 908, 109 S.Ct. 3222, 106 L.Ed.2d 571 (1989). Both Mandacina's gambling conviction and Strada's "fingering" of Mandacina occurred before Mandacina's immunized testimony and were independently proven. The prosecutor did not use the testimony, and no *McDaniel* violation occurred.

 Next, Mandacina argues error because the same grand jury which heard his immunized testimony regarding gambling returned the indictment against him in this case, citing *United States v. Garrett,* 797 F.2d 656 (8th Cir.1986) (*Garrett I*), *appeal after remand,* 849 F.2d 1141 (8th Cir.1988) (*Garrett II*). *Garrett I* held "that the practice of securing an indictment from the same grand jury which heard a witness's immunized testimony does not in itself constitute a violation of the fifth amendment privilege against self-incrimination." *Id.* at 663 (rejecting the per se rule established by the

**1184**

Second Circuit in *United States v. Hinton,* 543 F.2d 1002 (2d Cir.), *cert. denied,* 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976)). Although "[g]enerally, prosecutors should not encourage grand juries to indict an immunized witness," *United States v. Zielezinski,* 740 F.2d 727, 733 (9th Cir.1984), an evidentiary hearing may permit the court to determine if the indictment rests on independent evidence. The court may find such independence, "for example, where the witness' immunized testimony is relatively brief, or where events before or after the witness testifies are undeniably the source for the evidence presented to the [indicting] grand jury." *Garrett I,* 797 F.2d at 663.

■ Here, following a *Kastigar* hearing, the district court concluded that "no prejudicial misconduct occurred … by scheduling the indictment in this murder-for-hire case before the same grand jury that heard the immunized testimony." *Mandacina,* slip op. at 1 (W.D.Mo. Sept. 20, 1993). As in *Garrett II,* Mandacina's grand jury testimony was "quite brief," Mandacina did not admit to anything concerning the current charges, events before and after Mandacina testified were "undeniably the source" for the evidence before the second grand jury, and nothing in the record indicates that the government had any evidence linking Mandacina to the murder until it obtained the statements of Earlywine and Dodds. *Garrett II,* 849 F.2d at 1142. The district court specifically stated that "[t]he Government's independent evidence … makes it certain, in my judgment, that the indictment was not caused or materially influenced by any lingering dislike for [Mandacina] that the grand jury might have acquired long before, when he testified before it." *Mandacina,* slip op. at n. 1 (W.D.Mo. Sept. 20, 1993). The district court did not err in so holding.

■ Finally, Mandacina argues that the government has not met its *Kastigar* burden by simply submitting grand jury transcripts to the district court for in camera inspection. However, the purpose of a *Kastigar* hearing is not necessarily defeated by submitting grand jury transcripts to the district court for *in camera* review. *See United States v. Byrd,* 765 F.2d 1524, 1533 (11th Cir.1985).

Although submission of the grand jury testimony for *in camera* review will not satisfy the *Kastigar* burden by itself, when coupled with an evidentiary hearing, as here, it may do so. In this case, *Kastigar* has not been violated.

## II.

■ McGuire and Mandacina contend that the district court erred in denying their motions for new trials based on the government's failure to comply with the disclosure requirements of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In *Brady,* the Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196–97. The *Brady* rule encompasses not only exculpatory evidence, but also impeachment evidence. *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). However, "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985).

### A.

Both McGuire and Mandacina argue that the grand jury testimony and statements to the F.B.I. of Brock Decastrogiovannimausolf were material evidence and wrongfully withheld by the government. Brock's grand jury testimony and statements to the F.B.I. related primarily to McGuire's, Earlywine's and Dodds' acquisition of weapons from Dennis Crouch in January of 1990, and her interaction with McGuire on May 15, 1990, the evening before Strada's murder.

McGuire contends that Brock's testimony and statements would have: (1) provided an additional basis for impeaching Earlywine and Dodds; (2) allowed him to present an

alternative theory that Earlywine had committed the murder; (3) allowed him to present evidence that he was not trusted among the members of organized crime and therefore would not have been approached with a murder-for-hire proposition; and (4) allowed him to challenge the jurisdiction of the district court.

■■■ While Brock's testimony and statements are somewhat exculpatory when viewed in the light which McGuire casts them, they are for the most part inculpatory and certainly do not rise to the level of undermining our confidence in the outcome. Although Brock's testimony and statements regarding the events surrounding McGuire's, Earlywine's and Dodds' acquisition of weapons from Dennis Crouch differed in some details from the accounts given by Earlywine and Dodds, they were largely consistent with Earlywine's and Dodds' testimony. Moreover, Earlywine's and Dodds' accounts of the gun transaction were inconsistent with each other and these inconsistencies were the subject of lengthy cross-examination of both witnesses. Thus, we see no reason to believe that knowledge of Brock's grand jury testimony, which differed in some respects from both Earlywine's and Dodds', but was generally corroborative, would have materially aided McGuire in his attempt to impeach Earlywine and Dodds. *See United States v. Roberts*, 848 F.2d 906, 908 (8th Cir.), *cert. denied*, 488 U.S. 931, 109 S.Ct. 322, 102 L.Ed.2d 340 (1988).

Furthermore, Brock's statement to the F.B.I. that John Sciontino acting on behalf of organized crime told Crouch that McGuire was a "snitch," "unpredictable," "uncontrollable," and not to be trusted, when viewed in the context of her testimony and statements as a whole, does not negate the inference that Mandacina would have approached McGuire with the murder-for-hire proposition. In addition to telling the F.B.I. about Sciontino's statements, Brock also stated that McGuire was at a meeting of organized crime figures which occurred on May 15, 1990, the evening before the actual homicide, and that McGuire was reputed to be a "hitman." Thus, any role Brock's testimony would have played in showing that members of organized crime viewed McGuire as untrustworthy would have been negated by her other statements.

Finally, we conclude that McGuire's contention that Brock's testimony would have provided a basis for the presentation of an alternate defense theory or for challenging the court's jurisdiction is without merit. The alternate theory and jurisdictional arguments could have been pursued with or without Brock's testimony and statements. Thus, Mandacina cannot now attribute his failure to pursue these arguments to the absence of Brock's testimony and statements.

Similarly, Mandacina's arguments regarding the government's suppression of Brock's grand jury testimony and statements to the F.B.I. fall short of undermining our confidence in the verdict. Mandacina argues that Brock's testimony and statements would have undermined the government's theory that he trusted McGuire enough to hire him for contract murder, and would have provided material evidence to impeach Earlywine and Dodds. However, we find it difficult to see how Brock's testimony that John Mandacina warned her to stay away from McGuire would undermine the government's theory that Mandacina hired McGuire to murder Strada. This statement, at most, establishes that Mandacina did not think McGuire was the type of individual Brock should be "hanging around" with.

Mandacina's argument that Brock's testimony and statements would have assisted in the impeachment of Earlywine and Dodds fails because, as we have already stated, Brock's testimony and statements were immaterial impeachment evidence.

The government's suppression of Brock's testimony and statements did not violate the *Brady* rule or the constitutional rights of either McGuire or Mandacina.

### B.

Mandacina argues that the government also violated *Brady* by failing to turn over certain F.B.I. reports detailing information provided by Larry Strada. Mandacina contends that the F.B.I. reports would have allowed him to show that Strada was provid-

ing information to the F.B.I. on many different crimes within this region, thus inculpating other individuals who had more of a motive to kill Strada than he did. During trial, the district court reviewed these reports *in camera* and made extensive remarks in ruling that the reports were more inculpatory than exculpatory and, therefore, were not *Brady* material.

██ After reviewing the reports, we find little to support Mandacina's argument that the reports might indicate that many other individuals would have an interest in murdering Strada. The only statement in the reports which is at all supportive of Mandacina's theory is a statement by Strada that J.P. Lascuola was "very concerned as to why certain individuals were not indicted along with him and the rest of the gang." According to the reports, Lascuola was specifically asking about Strada. However, Lascuola testified at trial that he knew Strada was cooperating with the F.B.I. Therefore, if Mandacina wished to argue that Lascuola had a motive to murder Strada, he could have.

Other than Strada's statements relating to Lascuola, the reports were more incriminating than exonerating. In the reports Strada stated that "John Mandacina had a nice size gambling business" and that he "did not realize how extensive that business was until the discussions occurred after the gambling raids." Strada also referred to a murder victim who was a frequent bettor with Mandacina and stated that Mandacina was "very concerned about his upcoming indictment for bookmaking." Given the predominantly incriminating nature of the reports, the district court did not err in holding that the reports were not discoverable as *Brady* material.

## III.

McGuire and Mandacina argue that the evidence failed to establish that they were guilty of using interstate commerce facilities in the commission of murder-for-hire. In reviewing challenges to the sufficiency of the evidence, we view the evidence in the light most favorable to the verdict, giving the government the benefit of all reasonable inferences. *Glasser,* 315 U.S. at 80, 62 S.Ct. at 469–70; *United States v. Jagim,* 978 F.2d 1032, 1041 (8th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2447, 124 L.Ed.2d 664 (1993). "We may overturn the jury's verdict only if we conclude that the evidence is such that a reasonable-minded jury must have entertained a reasonable doubt as to the government's proof of one of the essential elements of the offense." *United States v. Sutera,* 933 F.2d 641, 648 (8th Cir.1991). The evidence need not exclude every reasonable hypothesis of innocence, but simply be sufficient to convince the jury beyond a reasonable doubt that the defendant is guilty. *United States v. O'Connell,* 841 F.2d 1408, 1424 (8th Cir.), *cert. denied,* 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 893 (1988). Our study of the trial record causes us to conclude that the evidence was sufficient to support the jury verdict.

██ In order to convict Mandacina and McGuire of using interstate commerce facilities in the commission of murder-for-hire, the government must have established that: (1) Mandacina caused McGuire to travel in interstate commerce from Illinois to Missouri to murder Strada; (2) McGuire travelled in interstate commerce with the intent that a murder be committed in violation of the laws of the State of Missouri; and (3) the murder was committed as consideration for a promise or agreement to pay money.[2] 18 U.S.C. § 1958(a) (1988).

2. 18 U.S.C. § 1958(a) reads:
(a) Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility in interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, shall be fined not more than $10,000 or imprisoned for not more than ten years, or both; and if personal injury results, shall be fined not more than $20,000 and imprisoned for not more than twenty years, or both; and if death results, shall be subject to imprisonment for any term of years or for life, or shall be fined not more than $50,000, or both.
18 U.S.C. § 1958(a).

First, the evidence was sufficient to establish beyond a reasonable doubt that Mandacina caused McGuire to travel in interstate commerce for the purpose of murdering Strada. Earlywine and Dodds testified that they were present when Mandacina and McGuire reached agreement on the murder-for-hire in January 1990; Angotti testified that McGuire confessed the crime to him; and there was also testimony which placed McGuire at a bachelor party in Rockford, Illinois, on May 12th, 1990, three days before Strada's murder. The above evidence would allow the jury to reasonably conclude that McGuire travelled from Illinois to Missouri to fulfill his contract to murder Strada. Thus, the jury could reasonably conclude that if Mandacina had not hired McGuire to murder Strada, he would not have travelled in interstate commerce to commit the murder, thereby making Mandacina the cause of McGuire's interstate travel.

Second, the evidence listed above also provided a sufficient basis for the jury to conclude beyond a reasonable doubt that McGuire travelled in interstate commerce with the intent to murder Strada. In view of the evidence, the jury could fairly conclude that McGuire's intent to commit the murder was formed in January 1990, continued up until the time that he committed the murder on May 16, 1990 and existed at the time that he travelled from Rockford, Illinois to Kansas City, Missouri, on some date between May 12, 1990, and May 16, 1990. *See United States v. Ellison*, 793 F.2d 942, 950–51 (8th Cir.), *cert. denied*, 479 U.S. 937, 107 S.Ct. 415, 93 L.Ed.2d 366 (1986) (holding that, under a similar statute, the government need only show that the defendant had the intent to carry on illegal activity and that the crime occurred in conjunction with interstate travel).

Finally, Earlywine's testimony that he was present when Mandacina asked McGuire to murder Strada and Mandacina's son-in-law for $25,000 provided a sufficient basis for the jury to have concluded beyond a reasonable doubt that McGuire's murder of Strada was in consideration of a promise to pay money.

## IV.

Mandacina argues that the district court abused its discretion by denying his motion for severance. He contends that had severance been granted, the jury would not have heard Frank Angotti's testimony that McGuire admitted to murdering Strada, nor would it have heard any reference to organized crime or "mob murder."

When reviewing the denial of a motion for severance, we will reverse the trial court's judgment only upon a showing of an abuse of discretion which resulted in "severe or compelling prejudice." *United States v. Rimell*, 21 F.3d 281, 289 (8th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 453, 130 L.Ed.2d 362 (1994); *United States v. Foote*, 920 F.2d 1395, 1398 (8th Cir.1990), *cert. denied*, 500 U.S. 946, 111 S.Ct. 2246, 114 L.Ed.2d 487 (1991). For this showing, Mandacina "shoulders a heavy burden." *United States v. Voss*, 787 F.2d 393, 401 (8th Cir.), *cert. denied*, 479 U.S. 888, 107 S.Ct. 286, 93 L.Ed.2d 261 (1986).

In the interest of judicial economy, when the right to a fair trial is not jeopardized, persons charged with the same offense will generally be tried together, particularly when the proof against the co-defendants is based upon the same evidence or conduct. *Id.* Neither disparity in the weight of evidence between co-defendants, *United States v. Pecina*, 956 F.2d 186, 188 (8th Cir.1992), nor added difficulty in defense, *United States v. Willis*, 940 F.2d 1136, 1139 (8th Cir.1991), *cert. denied*, —— U.S. ——, 113 S.Ct. 1411, 122 L.Ed.2d 782 (1993), entitle Mandacina to severance.

Mandacina argues that had severance been granted, the jury would not have heard Angotti's testimony that McGuire admitted killing Strada. However, the Confrontation Clause is not violated by the admission into evidence of a non-testifying co-defendant's admission of a crime, so long as a proper limiting instruction is given and the admission does not refer to the defendant. *Richardson v. Marsh*, 481 U.S. 200, 211, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987). McGuire's admission did not mention Mandacina, Mandacina and his counsel were ex-

cused from the courtroom during Angotti's testimony, and the district court instructed the jury that Angotti's testimony related only to McGuire.[3] These precautions by the district court minimized the prejudice to Mandacina by Angotti's testimony.

Mandacina also argues that severance would have kept from the jury references to organized crime or "mob murder." Specifically, Dodds and Earlywine testified about various comments McGuire made to them regarding organized crime in Kansas City. The district judge instructed the jury that any such references were to be used to determine McGuire's motive to commit the crime, not as evidence of Mandacina's actual involvement in organized crime. Accompanied by these instructions, the district court properly admitted McGuire's statements and, again, any prejudice to Mandacina was minimized by the instruction of the district court.

The district court minimized any prejudice to Mandacina resulting from the admission of Angotti's testimony and the prosecution's references to organized crime. Mandacina has failed to show that any resulting prejudice was either compelling or severe. The district court did not err in denying the motion for severance.

## V.

McGuire argues that the district court abused its discretion by admitting evidence of grocery store and bank robberies which McGuire, Earlywine, and sometimes Dodds committed between March of 1986 and November of 1989. Rule 404(b) limits the admissibility of evidence of other crimes to prove character, but allows such evidence for other purposes. Fed.R.Evid. 404(b). McGuire contends that the evidence does not fall within an exception to Rule 404(b) and is more prejudicial than probative. Fed. R.Evid. 403. The government contends that Rule 404(b) does not apply because the evi-

dence of the robberies is "intrinsic evidence" which is inextricably intertwined as "an integral part of the immediate context of the crime charged." *United States v. Bass*, 794 F.2d 1305, 1312–13 (8th Cir.), *cert. denied*, 479 U.S. 869, 107 S.Ct. 233, 93 L.Ed.2d 159 (1986). At trial, the district court admitted the evidence as non–404(b) evidence.

We are persuaded that the evidence regarding the previous robberies was an integral part of the crimes charged. Evidence of these other crimes is admissible to explain the circumstances of Strada's murder. *Id.* at 1312 (citations omitted). The robberies clarified the relationship between Mandacina, McGuire and Earlywine. The robberies brought both McGuire and Earlywine to Kansas City on numerous occasions to obtain firearms through the Mandacinas and to launder money. Most importantly, the robberies explained why McGuire would entrust Earlywine with knowledge of the Strada murder and why Mandacina would discuss a contract murder with McGuire, in Earlywine's presence, without fearing that he would be reported to the authorities immediately.

In light of the above, the evidence was more probative than prejudicial. The trial court need not issue a prior crimes limiting instruction sua sponte. *See United States v. Williams*, 994 F.2d 1287, 1290 (8th Cir.1993) (holding that failure to give a limiting instruction for 404(b) evidence is not plain error). We see no reason to treat the admission of non–404(b) prior crimes evidence differently in this respect. Thus, we affirm the trial court's admission of the evidence of prior robberies.

## VI.

Mandacina contends that the government's references to organized crime and

---

**3.** When Angotti was called to the stand, the district judge said, "[Angotti's testimony] is expected by the Government to relate to Mr. McGuire, not Mr. Mandacina. You should consider it as relating to Mr. McGuire to the extent that you believe the testimony." After a sidebar and before Angotti testified, the district judge called a noon recess and excused Mandacina and his

counsel from the courtroom. After the recess, Angotti was recalled and the district judge stated, "Members of the jury, you perhaps have noted that Mr. Mandacina and counsel are not in the courtroom, and they have asked to be excused because of the point that was made earlier that the testimony related to Defendant McGuire, but does not relate to Defendant Mandacina."

"the mob" during closing arguments exceeded the scope of admissible evidence and deprived him of a fair trial. We reject this argument.

During trial, in response to an objection by Mandacina, the court instructed the jury that the government's references to organized crime were being admitted only to indicate that McGuire may have been motivated to agree to the murder-for-hire because he believed that Mandacina was involved with organized crime, and not for the purpose of proving that Mandacina was a member of an organized crime group.[4] After Mandacina objected to the fact that limiting instruction was not included in the written instructions given to the jury, the court again reminded the jury that the government had no intention of proving or evidence to support that Mandacina was a member of organized crime.

■■■ It is well established that prosecutorial misconduct in closing arguments may result in the reversal of a conviction. *United States v. Johnson,* 968 F.2d 768, 769 (8th Cir.1992). In assessing whether prosecutorial misconduct is reversible, we apply a two part test: (1) the prosecutor's remarks or conduct must in fact have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial. *Id.* at 770. Moreover, we accord the trial court broad discretion in controlling closing arguments and will not reverse a conviction absent a showing of an abuse of discretion. *Id.* at 769–70.

The government's references to the mob and organized crime in its summation were consistent with the court's ruling concerning the admissibility of the evidence at trial. The government never accused Mandacina of being a member of the mafia, nor was the government's argument an attempt to prejudice or inflame the jury. The government's references to organized crime were all arguably related to the government's theory that McGuire's motivation stemmed from his desire to ingratiate himself with the mafia and that he believed Mandacina was associated with the mafia.

■■■ Mandacina points to a number of statements made by the government in its closing remarks as exceeding the scope of admissible evidence. However, having reviewed the transcript, we conclude that only the government's statement that "[w]e are talking about a contract hit here, a mob murder," comes close enough to exceeding the scope of permissible argument to warrant comment. This statement is ambiguous. Although one could argue that the government was implying that Mandacina was a member of the mob, one could just as easily argue that the statement was merely describing the style of the murder or McGuire's state of mind when he committed the murder. The district court concluded that the statement was not improper and given the statement's ambiguity, we cannot say that the district court abused its discretion in so ruling.

■■■ Even if we concluded that the statement was improper, Mandacina's argument would still fail because the remark did not prejudicially affect Mandacina's substantial rights so as to deprive him of a fair trial. In determining whether the prejudicial effect of prosecutorial misconduct deprived a defendant of a fair trial, this court considers: (1) the cumulative effect of the misconduct; (2)

---

4. The court instructed:

Members of the jury, it may be useful to clarify a point for you at this time. You have heard evidence that the Defendant McGuire said that he wanted to work for persons in Organized Crime or the Mafia.

The evidence is presented to you so that you may determine if McGuire planned to get involved in serious criminal acts, like that charged in this case, or if he was motivated to get involved.

It is not offered to suggest that Defendant Mandacina was a member of an Organized Crime group other than the gambling reference that has been made previously in Opening Statement by the Government, but that is presented to you to indicate that the Defendant McGuire may have guessed or believed that Mandacina was so involved, or McGuire was simply speaking loosely when he used terms of that nature.

You should understand that the Government will not be attempting in this trial to show that John Mandacina is or was a member of Organized Crime as that term is so frequently used, but simply that McGuire believed that Mandacina was so associated.

the strength of the properly admitted evidence of the defendant's guilt; and (3) the curative actions taken by the trial court. *Johnson*, 968 F.2d at 771. The conduct in question has no cumulative effect, because we are dealing with only a single remark which might be construed as improper. Furthermore, there was strong evidence that Mandacina was guilty of the crime of which he was convicted. Moreover, any prejudicial effect which may have been caused by the remark was cured by the court admonishing the jury, on two occasions, that the government had no proof that Mandacina was associated with organized crime.

The district court successfully "protected defendant Mandacina from being smeared as an organized crime figure, likely to be the subject of jury hostility regardless of the charge." *United States v. Mandacina*, No. 93–00073, slip op. at 2 (W.D.Mo. Nov. 2, 1993). The district court did not abuse its discretion in denying Mandacina's motion for a new trial.

We affirm the convictions.

MORRIS SHEPPARD ARNOLD, Circuit Judge, concurring and dissenting.

I concur in all of the well-reasoned opinion of the court in this case except so much of it as concludes that there was sufficient evidence to support a conviction for using interstate commerce facilities in the commission of murder-for-hire. In order to convict on this count, the jury must have had evidence from which reasonable minds could conclude, beyond a reasonable doubt, that McGuire travelled in interstate commerce with the intent to commit a murder. I believe that McGuire's state of mind at the time that he crossed a state line is virtually unknowable from this record, and that, whatever the jury might have properly concluded in a civil case, a reasonable mind must have entertained a reasonable doubt about McGuire's ideas at the relevant time. McGuire had many dealings in Missouri and frequently travelled in and out of the state. We cannot even know beyond a reasonable doubt when he travelled to Missouri to murder Mr. Strada, much less what was in his mind at the time he did so.

I would therefore reverse the conviction on Count III, but affirm the judgments in all other respects.