**United States Court of Appeals**

**FOR THE EIGHTH CIRCUIT**

_____

No. 96-3346

_____

United States of America,    *
                             *
    Plaintiff - Appellee,    *
                             *
    v.                       *
                             *
Charles Edwin Davidson,      *
                             *
    Defendant - Appellant.    *
                             *
                             *

_____          Appeals from the United
States

District Court for the
No. 96-3396       Eastern District of
Arkansas.

_____                  *
                             *
United States of America,    *
                             *
    Plaintiff - Appellee,    *
                             *
    v.                       *
                             *
Earnes Lee Smith,            *
                             *
    Defendant - Appellant.    *

United States of America,  *
                                      *

    Plaintiff - Appellee,  *
                                        *

    v.                          *
                                        *

Dwayne Harold Smith,     *
                                        *

    Defendant - Appellant. *
_____

Submitted:  April 16, 1997
    Filed:   August 8, 1997
_____

Before LOKEN, MAGILL, and MORRIS SHEPPARD ARNOLD, Circuit
    Judges.
_____

LOKEN, Circuit Judge.

These are consolidated appeals from the two trials needed to resolve a ten-count indictment. After the first trial, a jury convicted Charles Davidson of racketeering, attempted interstate murder-for-hire, transferring a firearm for murder, distributing methamphetamine, mail fraud, and arson affecting interstate commerce. However, it could not reach a verdict on Count II charging Davidson, Earnes Smith, and Dwayne Smith with a second interstate murder-for-hire. After a retrial of Count II, the second jury convicted all three defendants. Davidson appeals his racketeering and murder-for-hire convictions at the first trial. All

three appeal their convictions at the second trial, raising various evidentiary issues. Finally, Dwayne Smith raises ineffective assistance of counsel issues. We affirm all three convictions.

# I. Sufficiency of the Evidence Issues.

Davidson challenges the sufficiency of the evidence at the first trial to convict him of racketeering, for which the district court[1] sentenced him to 360 months in prison, and of attempted interstate murder-for-hire, for which he received a concurrent 120-month sentence.[2] Davidson and the Smiths challenge the sufficiency of the evidence at the second trial to convict them of aiding and abetting the interstate murder-for-hire of Darryl Cooperwood, for which each received a sentence of life in prison without possibility of parole. We will separately address these sufficiency-of-the-evidence issues, viewing the facts in the light most favorable to the jury verdicts. See <u>United States v. Kragness</u>, 830 F.2d 842, 847 (1987). We reject as without merit Davidson's additional contention that we should grant him a new trial because no government witness was credible. See <u>United States v. Reeves</u>, 83 F.3d 203, 206 (8th Cir. 1996).

<u>A. The RICO Conviction.</u> Witnesses at the first trial portrayed Davidson as the leader of a local criminal organization. His auto lot and body shop were the base for theft and disassembly of stolen cars and trucks. His associates burglarized houses, defrauded insurers, sold

---

[1]The HONORABLE GEORGE HOWARD, JR., United States District Judge for the Eastern District of Arkansas.

[2]Davidson does not challenge on appeal his conviction and concurrent sentences for distribution of methamphetamine (240 months), transfer of a firearm for murder (120 months), two counts of arson (120 months), and mail fraud (60 months).

drugs, and committed arson and murder to punish Davidson's enemies and protect his criminal enterprise. Numerous witnesses accused Davidson of a wide variety of crimes, including the attempted murder of his half-sister, the arson of her attorney's home, and an attempt to hire the local sheriff to murder a former accomplice. The jury convicted Davidson of violating the federal anti-racketeering statute, commonly known as RICO, which makes it a crime "for any person employed

by or associated with any enterprise . . . to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c). On appeal, Davidson argues that the government failed to present sufficient evidence of a RICO "enterprise."

An "enterprise" is defined in RICO to include "any individual . . . or other legal entity, and any . . . group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The enterprise at the heart of a RICO violation may be a legitimate business, for example, one used to launder the proceeds of criminal activity, or may itself be an entirely criminal "association in fact." When the government alleges that a criminal organization is the RICO enterprise, it must define and prove the existence of an enterprise that is "separate and apart from the pattern of [criminal] activity in which it engages." United States v. Turkette, 452 U.S. 576, 583 (1981). In applying Turkette, we look at whether the alleged enterprise has common or shared purposes, some continuity of structure and personnel, and a structure distinct from that inherent in the alleged pattern of racketeering activity. See, e.g., Kragness, 830 F.2d at 855. Our focus is to ensure that RICO's severe penalties are limited to "enterprises consisting of more than simple conspiracies to perpetrate the predicate acts of racketeering." United States v. Bledsoe, 674 F.2d 647, 664 (8th Cir.), cert. denied, 459 U.S. 1040 (1982).

Davidson argues that the government proved only "sporadic criminal predicate acts," not the requisite

common purpose, and that there was no proof of an organization having the requisite continuity and a structure distinct from that inherent in the pattern of racketeering offenses. We disagree. Davidson ran a small but prolific crime ring. Initially, stepson Tim Scarbrough and Roger Rollet were the foot soldiers, stealing cars and trucks and burglarizing homes. Davidson "chopped" the stolen cars in his shop and fenced the other stolen goods. But Davidson was more than an outlet for stolen goods. He instructed Scarbrough and Rollet to burn cars and houses, both for insurance proceeds and for intimidation. He financed their drug activities and provided

other support for his criminal associates. When Scarbrough went to prison, Tony Webster filled in, stealing cars, supplying Davidson with drugs for distribution, and serving as his enforcer, while Davidson paid $5,000 to murder Cooperwood for setting Scarbrough up with an undercover police officer.

The length of these associations, the number and variety of crimes the group jointly committed, and Davidson's financial support of his underlings demonstrate an ongoing association with a common purpose to reap the economic rewards flowing from the crimes, rather than a series of ad hoc relationships. See Turkette, 452 U.S. at 583. Davidson's continued leadership provided continuity of personnel at the top of the criminal organization. See United States v. Lemm, 680 F.2d 1193, 1200 (8th Cir. 1982), cert. denied, 459 U.S. 1110 (1983). Its members had "the family and social relationships" that helped define a criminal RICO enterprise in United States v. Leisure, 844 F.2d 1347, 1363 (8th Cir. 1988), cert. denied, 488 U.S. 932 (1988). Numerous acts of retaliation and intimidation committed at Davidson's direction, and his attempt to involve the local sheriff in a murder-for-hire, evidence a criminal enterprise broader than and distinct from its constituent criminal activities. As in Kragness, 830 F.2d at 857, "the activities of the group exhibit a pattern of roles and a continuing system of authority; the essential identity of the enterprise endured." The evidence was sufficient to convict Davidson of violating 18 U.S.C. § 1962(c).

B. The Cooperwood Murder. In 1991, stepson Scarbrough went to prison for selling marijuana to an

undercover officer.  At the second trial, Sandra Querry testified that in March 1992 Davidson told her he would pay $5,000 for Cooperwood's murder because Cooperwood had introduced Scarbrough to the undercover officer.  Querry relayed this offer to her boyfriend, Earnes Smith.  On March 21, Querry accompanied Earnes to the Little Rock Airport where they met his son Dwayne arriving from New Orleans.  Cooperwood was murdered later that week.  The morning after the murder, Querry overheard Earnes and Dwayne talking about making sure "the body was dead," and Earnes told Querry to go "pick up his money."  She then drove to Davidson's

house.  Davidson gave her $4400, admitting he was $600 short and telling Query he would "get with [Earnes] later and settle up the rest."  The jury convicted all three defendants of aiding and abetting an interstate murder-for-hire in violation of 18 U.S.C. § 1958(a), which provides in relevant part:

> Whoever travels in or causes another . . . to travel in interstate or foreign commerce . . . with intent that a murder be committed in violation of the laws of any State . . . as consideration for the receipt of, or as consideration for a promise or agreement to pay . . . if death results, shall be punished by death or life imprisonment . . . .

Section 1958 does not prohibit murder.  It outlaws causing travel or the use of interstate commerce facilities with the intent that murder-for-hire be committed.  See United States v. Delpit, 94 F.3d 1134, 1149 (8th Cir. 1996); United States v. McGuire, 45 F.3d 1177, 1186 (8th Cir.), cert. denied, 115 S. Ct. 2558 (1995).  The government's theory, which the jury obviously accepted, was that Davidson's promise of money for Cooperwood's murder resulted in Earnes Smith causing Dwayne Smith to travel in interstate commerce, each of the three intending that murder-for-hire be committed. Davidson and Earnes argue there was insufficient evidence they caused Dwayne to travel in interstate commerce with intent to murder.  Dwayne argues there was insufficient evidence he traveled in commerce with intent to murder. We disagree.

Defendants note that there was no evidence Davidson met with Earnes to discuss a murder-for-hire, no direct

-10-

evidence the Smiths spoke on the phone prior to Dwayne's arrival in Arkansas, and no proof that Dwayne intended to commit murder when he made what they describe as a routine trip to visit his father.  However, the government may establish its case through circumstantial evidence, and the jury may draw all reasonable inferences from that evidence.  See United States v. Davis, 103 F.3d 660, 667 (8th Cir. 1996), cert. denied, 65 USLW 3798 (1997).  There was direct evidence that Davidson made an offer to pay for Cooperwood's murder to someone he could expect to communicate that offer to Earnes Smith.  There was circumstantial evidence

that the Smiths talked by phone prior to Dwayne's arrival in Arkansas.  Telephone records show a March 18, 1992, call from Earnes's home in Arkansas to Dwayne's home in New Orleans, where he lived with his mother, and calls from Dwayne's home to Earnes's home on March 19 and again on March 21, the day Earnes picked Dwayne up at the Little Rock airport.

There was also circumstantial evidence that Dwayne came to Arkansas to aid in a murder-for-hire, meaning that the Smiths had discussed the scheme by phone.  Dwayne stayed at Sandra Query's apartment in Arkansas where he could keep a low profile.  Though unemployed at the time, he purchased a plane ticket to Arkansas, paid $500 in traffic warrants while in Arkansas, purchased a Lincoln Continental from Earnes for $500, and returned to New Orleans with $1000 cash.  After Querry collected the hit money from Davidson, Dwayne told her, "[i]f I give pops a thousand dollars for the car, then I would have a thousand dollars left for myself."  Querry responded that "it was $5000."  Angrily, Dwayne replied, "pops got me again."

The government's evidence must have impressed the defense, for Dwayne Smith took the stand at the end of the trial.  He flatly denied talking to his father by phone before arriving in Arkansas.  He explained where he got money to spend in Arkansas, but the explanation impeached his earlier testimony that he never sold drugs illegally before 1992.  And he denied admitting the murder of Cooperwood to a boyhood friend who had testified for the government.  Obviously, the jury disbelieved this testimony.  When there is other corroborative evidence of

guilt, the jury can properly draw an inference of guilt from its disbelief of the defendant's denials. See United States v. Brown, 53 F.3d 312, 314-15 (11th Cir. 1995), cert. denied, 116 S. Ct. 909 (1996); United States v. Zafiro, 945 F.2d 881, 888 (7th Cir. 1991), aff'd on other grounds, 506

U.S. 534 (1993).  We conclude the evidence was sufficient to convict each defendant of aiding and abetting a violation of § 1958(a).[3]

C. Davidson's Second Murder-for-Hire Conviction. Dottie Holmes is Davidson's half sister.  Though once close, their relationship deteriorated after Davidson married Mona Davidson.  In the spring of 1994, Mona phoned her brother, David Travis, saying that Davidson would have a job for him if Travis came to Arkansas from his home in the State of Washington.  When Travis arrived, Davidson offered him $15,000 to kill Dottie Holmes.  The jury convicted Davidson of violating § 1958 by aiding and abetting in the use of an interstate facility (the telephone) with intent that a murder-for-hire be committed.  Davidson argues the evidence was insufficient because Travis did not know of the murder scheme until he arrived in Arkansas and therefore lacked the requisite intent to murder.

This argument is foreclosed by the plain language of § 1958.  The statute is violated by anyone who "uses or causes another (including the intended victim) to use . . . any facility in interstate or foreign commerce, with intent that a murder be committed."  Davidson caused Mona to solicit a murder-for-hire by telephone.  The statute does not say that both parties to the resulting telephone conversation must be aware of the murder scheme.  Any

_____

[3]There was little if any evidence that Davidson knew or had reason to know that Earnes Smith would summon Dwayne from New Orleans to assist in the murder-for-hire.  Davidson does not argue that this precludes *his* conviction for aiding and abetting a violation of § 1958, and we do not consider the issue.

party who uses the telephone or causes its use with the requisite murderous intent violates § 1958(a).  <u>See</u> <u>United States v. Razo-Leora</u>, 961 F.2d 1140, 1148 (5th Cir. 1992). Mona Davidson's testimony as a government witness provides a sufficient basis for the jury's conclusion that Davidson intended to contract for murder when he caused Mona to make the telephone call to Travis.

## II. Evidentiary Issues.

A. Evidence of Davidson's Additional Crimes.  At the second trial, Dottie Holmes, Michael Holmes, and Melvin Redman each testified that Davidson admitted orchestrating the Cooperwood murder.  They also testified to other Davidson misdeeds.  Dottie Holmes testified that she was afraid of Davidson because of his criminal activities -- "[s]tolen vehicles, burning people's houses, burning people's vehicles" -- and described how Davidson harassed her after she refused to deed certain property to him. Michael Holmes described Davidson's attempts to plant drugs in his truck and to burn their home after Dottie's relationship with Davidson soured.  Melvin Redman described hiring Davidson to steal a truck for Redman's sister-in-law.  On appeal, Davidson argues that these other crimes had nothing to do with the Cooperwood murder and therefore the district court abused its discretion in admitting this evidence under Federal Rule of Evidence 404(b).

The district court took up this issue prior to the start of the second trial.  After the prosecution explained that the evidence would be relevant because fear of Davidson explained why these witnesses had not come forward sooner, and because Davidson's relationship with Dottie Holmes was relevant background to her testimony as to Davidson's admissions, Davidson argued that the evidence should be excluded as more prejudicial than probative -- a Rule 403 objection.  The district court ruled that the evidence was relevant and offered to give a cautionary instruction to avoid unfair prejudice.  This ruling was well within the court's broad evidentiary

discretion.  <u>See, e.g.</u>, <u>United States v .Wagoner</u>, 713 F.2d 1371, 1375 (8th Cir. 1983).  Moreover, any error was harmless.  More than a dozen people testified that Davidson admitted soliciting Cooperwood's murder, including Davidson's wife, his half-sister, his stepson, his brother-in-law, old friends, and criminal associates. Davidson was convicted by this overwhelming testimony, not by descriptions of his other crimes.

We also reject Earnes Smith's contention that evidence of Davidson's past crimes should have been excluded because it was prejudicial to Smith as Davidson's co-defendant. The district court did not abuse its discretion by admitting this evidence but giving the jury a cautionary instruction that it was admissible only against Davidson. See United States v. Mason, 982 F.2d 325, 327 (8th Cir. 1993).

B. An Admission by Earnes Smith. At the second trial, Sandra Querry testified that some time after the Cooperwood murder, Earnes Smith told her that Davidson had approached him about "doing another job" and Earnes refused, telling Davidson "if he didn't have the backbone or the guts to do it himself, [I] wasn't going to do it for him." The district court admitted this testimony because it tended to prove a prior relationship between Smith and Davidson and "the inferences are far from speculation and conjecture." On appeal, Smith and Davidson argue that this testimony should have been excluded because it did not clearly relate to Cooperwood's murder and therefore invited the jury to speculate prejudicially about what the "other job" might have been. We will reverse only for clear abuse of the district court's broad discretion to admit or exclude evidence at trial. See United States v. Emmanuel, 112 F.3d 977, 979 (8th Cir. 1997). We agree with the court that Smith's admission about "another job" requiring "guts" evidenced a relevant prior relationship with Davidson. Moreover, to the extent the link to Cooperwood's murder was weak, any resulting prejudice was weak. In other words, the district court did not abuse its discretion in admitting this testimony because its probative value was at least

as strong as any *unfair* prejudice.  <u>See</u>  <u>United States v.</u> <u>Mihm</u>, 13 F.3d 1200, 1204 (8th Cir. 1994).

<u>C. The Motion for Mistrial.</u>  Prior to the second trial, the prosecution agreed to avoid references to the death of Marlene Holt, Davidson's former girlfriend. Sandra Querry nonetheless gave the following testimony on direct examination:

Attorney:  What was the purpose for all this moving around that you did?

Querry:     Because I was in fear for my life after my statement.

Attorney:   Who were you in fear for you life from?

Querry:     Butch Davidson.

Attorney:   Why is that?

Querry:     Because I know his reputation, and I felt like if I made a statement against him, that Marlene was already dead, and I didn't want to be next.

Defense counsel moved for a mistrial.  The district court instead offered a cautionary instruction, which defendants declined.  On appeal, Davidson and Earnes Smith argue that the prejudice from this testimony could not be cured by a cautionary instruction and therefore the district court erred in denying a mistrial.  The reference to Marlene Holt was brief and vague, "simply one of those unexpected developments that occurs in the course of a trial."  United States v. Flores, 73 F.3d 826, 832 (8th Cir.), cert. denied, 116 S. Ct. 2568 (1996).  The district court has broad discretion to grant or deny a motion for mistrial because it is in a far better position to weigh the effect of improper testimony, and because less drastic measures such as a cautionary instruction are generally sufficient to alleviate prejudice flowing from improper testimony.  We conclude there was no abuse of discretion in denying defendants a mistrial.

D. The Autopsy Photographs.  The district court admitted into evidence four photographs taken during the

autopsy of Darryl Cooperwood.  Davidson and Earnes Smith argue that the court abused its discretion because the photos were cumulative to crime scene photos and therefore unduly prejudicial.  A trial court has discretion to admit a relevant photograph unless it is "so gruesome or inflammatory that its prejudicial impact substantially outweigh[s] its probative value."  <u>United States v. Petary</u>, 857 F.2d 458, 463 (8th Cir. 1988).  Though graphic, the autopsy photographs were less gruesome than the crime scene photos, and they helped explain the testimony

of Dr. William Sturner, the government witness who performed the autopsy. Their admission was not an abuse of discretion.

### III.  Ineffective Assistance of Counsel.

At sentencing, Dwayne Smith accused his trial counsel of ineffective assistance. The district court continued the sentencing and appointed new counsel, who moved for a new trial on this ground. After a hearing, the district court denied the motion. On appeal, Smith argues that trial counsel was constitutionally deficient in two respects.

First, Smith argues that counsel failed to call Nettie Jones, Smith's girlfriend, to testify that Smith usually lived with Ms. Jones, not his mother, during March 1992 when the phone calls were made between Earnes Smith's residence in Arkansas and the mother's residence in New Orleans. At the new trial hearing, Ms. Jones could not be located and therefore did not testify. Smith's trial counsel testified that Nettie Jones was not among the potential witnesses Smith asked him to interview. Smith's mother testified that she refused to attend the second trial and that Smith did stay at her home from time to time during the period in question. (Smith testified at trial that he *was* living with his mother.) On this record, counsel was not ineffective in failing to call Nettie Jones. See Bowmann v. Gammon, 85 F.3d 1339, 1345 (8th Cir. 1996), cert. denied, 117 S. Ct. 1273 (1997) (decision not to call a witness is "virtually unchallengeable" trial strategy).

Second, Smith argues that counsel was ineffective for failing to move for a severance because Davidson was a career criminal responsible for multiple murders, attempted murders, and arson whose presence as a co-defendant prejudiced Smith's defense.  At the new trial hearing, Smith did not ask counsel to explain why he did not seek a severance, so the record will not support the conclusion "that the behavior of counsel fell measurably below that which might be expected from an ordinary fallible lawyer."  Nolan v. Armontrout, 973 F.2d 615, 618 (8th Cir. 1992).  Moreover, Smith

was not prejudiced because a motion for severance would have been denied. Earnes Smith moved for severance before the first trial, and his motion was denied; there was less reason for severance at the second trial because additional criminal charges against Davidson were no longer at issue. Severance will not be granted simply because the evidence against one defendant is stronger, or because one defendant believes that his chances for acquittal would be better in a separate trial. See Zafiro v. United States, 506 U.S. 534, 540 (1993); United States v. Humphreys, 982 F.2d 254, 259 (8th Cir. 1992), cert. denied, 510 U.S. 814 (1993). Dwayne Smith's motion for a new trial was properly denied.

The judgments of the district court are affirmed.

MORRIS SHEPPARD ARNOLD, Circuit Judge, concurring and dissenting.

I concur in all of the court's opinion except the portion of it that upholds Dwayne Smith's conviction under 18 U.S.C. § 1958(a). While it may be that a reasonable juror could believe that the evidence presented at trial supported an inference sufficiently strong to establish that Mr. Smith was probably guilty of this offense, I think that a reasonable juror would have had to entertain a reasonable doubt that he was guilty.

I therefore respectfully dissent.

A true copy.

    Attest:

-24-

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.