# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 97-2365

_____

United States of America,                    *
                                              *
                    Appellee,                 *
                                              *
        v.                                    *
                                              *
Craig Scott Keltner,                          *
                                              *
                    Appellant.                *

                                                Appeals from the United States
        _____                             District Court for the
                                                Eastern District of Arkansas.
        No. 97-2370

        _____

United States of America,                    *
                                              *
                    Appellee,                 *
                                              *
        v.                                    *
                                              *
Charles Bruce Nabors,                         *
                                              *
                    Appellant.                *

                    _____

            Submitted:  January 14, 1998
                Filed:  June 5, 1998

                    _____

Before BOWMAN, Chief Judge, MORRIS SHEPPARD ARNOLD, Circuit Judge, and JONES[1], District Judge.

_____

JONES, District Judge.

After a three week trial in which 104 witnesses testified and approximately 200 exhibits were introduced, defendants Craig Scott Keltner and Charles Bruce Nabors were convicted by a jury of a violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c). The jury found the defendants committed the following racketeering acts: robbery and kidnaping of Bill Anderson, robbery of Donna Johnson, interstate transportation of stolen property, conspiracy to rob and extort money from and attempted robbery of the Woodland Bank in Tulsa, Oklahoma, kidnaping of George Foster and Karen Fisher Perkins, wire fraud (Nabors only) and robbery and kidnaping of Vandy S. Gavin (Keltner only).

Both defendants were also convicted of conspiracy to commit extortion and robbery and interstate transportation of stolen jewelry. In addition, Nabors was convicted of mail and wire fraud, felon in possession of a firearm and possession of a stolen firearm. Keltner was convicted of structuring a cash transaction.

The District Court[2] sentenced Nabors to life imprisonment and sentenced Keltner to thirty years' imprisonment. Both appeal their convictions. We affirm the convictions of both defendants.

## I. BACKGROUND

_____

[1]The Honorable John B. Jones, United States District Judge, United States District Court for the District of South Dakota, sitting by designation.

[2]The Honorable Stephen M. Reasoner, United States District Judge, United States District Court for the Eastern District of Arkansas.

The events involved in this prosecution commenced following Nabors' release from federal custody on parole in November 1990. In December 1990, Fern Kilgore's Ford Bronco was stolen. Kilgore's Bronco was rammed into a Radio Shack store during a burglary in January 1991. Billy Keltner, Keltner's brother, admitted his participation and implicated Nabors in the burglary of the Radio Shack store during an interview on February 25, 1991 with Federal Bureau of Investigation (FBI) agents and other law enforcement officials. Several compatible walkie-talkies and police scanners were stolen from the store. A police scanner guide of the brand sold exclusively by Radio Shack was later recovered by law enforcement from Keltner's car. Billy Keltner stated that Nabors did not find the specific type of microphone he wanted in the Radio Shack store so they burglarized a second store, where Nabors obtained the type of microphone for which he was looking. The internal components of one such microphone were identified as similar to the microphone used on a hoax bomb device involved in an extortion and robbery attempt of the Woodland Bank in Tulsa, Oklahoma. The items stolen from Radio Shack and the second store were similar to the items used in several subsequent crimes of which Keltner and Nabors were convicted.

The jury found Nabors and Keltner guilty of the January 1991 robbery and kidnaping of Bill Anderson. During the FBI interview on February 25, 1991, Billy Keltner admitted he participated in this crime. Anderson's description of the crime during his trial testimony coincides with Billy Keltner's description given to the FBI. The items stolen from Anderson included guns, cash, jewelry, a photograph of Keltner's sister and a vehicle. Some of these items, including the vehicle and a gun, were later recovered by Anderson. The stolen jewelry had a value of between $21,000 and $22,000. Anderson identified Nabors at trial as one of the perpetrators of the robbery and kidnaping.

The jury also found Nabors and Keltner guilty of the January 1991 robbery of Donna Johnson. The items stolen from Johnson included jewelry valued at $241,000, firearms, a camera, cash and a Cadillac. Johnson's Cadillac was later recovered. Billy Keltner admitted his participation in this crime to the FBI. Johnson testified at trial regarding the details of the robbery in her home. Billy Keltner's descriptions of the crime and the jewelry taken (including a Rolex watch) are almost identical to Johnson's trial testimony.

Keltner was found guilty of the robbery and kidnaping of Vandy S. Gavin. Gavin identified Keltner at trial as the person who robbed him in his home. Wade Wallis testified at trial that he, Keltner and Billy Keltner committed the robbery of Gavin in March 1991.

The jury found Keltner and Nabors guilty of conspiracy to commit extortion and robbery of the Woodland Bank in Tulsa, Oklahoma (Tulsa bank robbery). The jury also found the Tulsa bank robbery was a racketeering act under the RICO count. Viewing the evidence most favorably toward the guilty verdict, United States v. Darden, 70 F.3d 1507, 1517 (8th Cir. 1995), cert. denied, 517 U.S. 1149 (1996), the record reveals the following facts. Bill Foster, President and CEO of Woodland Bank, and Karen Fisher Perkins, Senior Vice President and Controller of Woodland Bank, were kidnaped by the defendants. Although Foster was not absolutely certain, he testified at trial he believed Keltner was the driver of the van involved in the crime and Nabors was the man in charge during the commission of the crime. Although Perkins had not identified Keltner or Nabors during lineups prior to trial, she identified Keltner during the trial as the driver of the van and Nabors as the man in charge. In addition, Nabors and Keltner admitted their participation in the Tulsa bank robbery (and some of the other burglaries and robberies discussed above) to several different individuals.

Defendants placed a device on Foster's car which was triggered to stop the car's engine. On June 14, 1991, Foster's car's engine stopped and could not be restarted.

-4-

Foster arranged for Perkins to give him a ride to work that morning. As Perkins was driving them to work, a van bumped into the back bumper of Perkins' car. Foster got out of the car to survey the damage. Nabors approached Foster with a gun and directed Foster to return to Perkins' car. Nabors got in the back seat of Perkins' car and directed Perkins to drive to a parking lot near the Woodland Bank. The van followed them to the parking lot.

Upon arriving in a parking lot, Nabors directed both Perkins and Foster to move to the van. Nabors ordered Foster to retrieve $1 million from the Woodland Bank. Foster informed the defendants the bank did not have $1 million cash on hand and the bank vault would not open for another 30 minutes. One of the defendants stated he knew the bank had $3.7 million. The most recent Statement of Condition of the Bank indicated the bank had $3.7 million in cash due from other banks. An employee of the bank testified that she believed Nabors came into the bank approximately one week prior to the Tulsa bank robbery and requested a copy of the Statement of Condition. The employee testified Nabors did all of the talking and a second man (younger than Nabors), dressed in white painters' pants, was with him. The employee did not identify the second man. Terry Leach and Darla Leach testified that Nabors and Keltner were in Oklahoma approximately one week prior to the Tulsa bank robbery. Darla Leach testified that Keltner was wearing white painters' pants during this visit to Oklahoma.

Following a discussion with Keltner about Foster's statement that the bank did not have $1 million in cash on hand, Nabors decided to have Foster retrieve all of the cash in the possession of the drive-up tellers. Nabors fastened a metal box with a cable around Foster's body and told Foster it was a bomb. Nabors told Foster to return to Perkins' car with the money and follow the map contained in the trunk of the car.

Foster entered the Woodland Bank and immediately called the FBI. The device placed on Foster was later found to be a microphone which allowed the defendants to hear what Foster was saying after he entered the bank. While Foster was driving to the

bank, Keltner drove the van to a second parking lot where Nabors and Keltner ordered Perkins to transfer to a brown car. Once they were in the brown car, Perkins could hear Foster's voice on a two-way radio possessed by Nabors. When Nabors and Keltner heard Foster call the police, their attempt to start the car failed. Perkins escaped out the back door, flagged down a car and was given a ride to the bank.

The defendants were initially indicted in October 1992 and were ultimately tried on a second superseding indictment filed in September 1993. The District Court initially dismissed the RICO count in 1993, and this Court reversed. United States v. Nabors, 45 F.3d 238 (8th Cir. 1995). The trial was commenced on July 29, 1996 and concluded on August 20, 1996.

## II. DISCUSSION

### A. RICO Violation

The RICO count against the defendants asserts a violation of 18 U.S.C. § 1962(c), which provides:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

### 1. Void For Vagueness

Defendants argue that the statutory substantive definition of RICO is void for vagueness as to the elements of enterprise and pattern of racketeering activity. "[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is

prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352, 357 (1983). Every circuit which has addressed the void-for-vagueness issue following the Supreme Court's decision in H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989) has held the RICO statute is not unconstitutionally vague.[3] We join our sister circuits in holding that the RICO statute is not unconstitutionally vague.

## 2. Admissibility Of Criminal Conduct Not Charged As Predicate Act

Defendants contend the District Court abused its discretion in admitting evidence of uncharged criminal conduct to establish the elements of RICO. Witness Gerald Perryman was allowed to testify about his recruitment by the defendants to participate in the robbery of a bank in Hot Springs, his involvement in the conspiracy to rob the bank, overt acts that he and the defendants committed in preparation of the planned robbery, and his eventual exclusion from the venture because Keltner discovered that he had mentioned it to his ex-wife.

---

[3] United States v. Angiulo, 897 F.2d 1169, 1179 (1st Cir.), cert. denied, 498 U.S. 845 (1990); United States v. Coonan, 938 F.2d 1553, 1561-62 (2nd Cir. 1991), cert. denied, Kelly v. United States, 503 U.S. 941 (1992); United States v. Pungitore, 910 F.2d 1084, 1102-05 (3rd Cir. 1990), cert. denied, 500 U.S. 915 (1991); United States v. Bennett, 984 F.2d 597, 605-06 (4th Cir.), cert. denied, 508 U.S. 945 (1993); United States v. Krout, 66 F.3d 1420, 1432 (5th Cir. 1995), cert. denied, Alvarez v. United States, 516 U.S. 1136 (1996); Columbia Natural Resources, Inc. v. Tatum, 58 F.3d 1101, 1106 (6th Cir. 1995), cert. denied, 516 U.S. 1158 (1996); United States v. Ashman, 979 F.2d 469, 487 (7th Cir. 1992), cert. denied, Barcal v. United States, 510 U.S. 814 (1993); United States v. Dischner, 974 F.2d 1502, 1508-11 (9th Cir. 1992), cert. denied, 507 U.S. 923 (1993); Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1398 (11th Cir. 1994), cert. denied, USX Corp. v. Cox, 513 U.S. 1110 (1995).

The District Court admitted the evidence at issue pursuant to our holding in United States v. Ellison, 793 F.2d 942, 949, cert. denied, 479 U.S. 937 (1986), that the government may prove the existence of an enterprise for purposes of RICO by introducing evidence not connected with the charges in the indictment provided the prejudicial aspects of the evidence do not outweigh its probative value. Upon reviewing the record, we find no abuse of discretion in the admission of the disputed evidence.

### 3. Sufficiency of Evidence To Sustain RICO Conviction

To establish a violation of RICO, the government must prove "(1) that an enterprise existed; (2) that the enterprise affected interstate or foreign commerce; (3) that the defendant associated with the enterprise; (4) that the defendant participated, directly or indirectly, in the conduct of the affairs of the enterprise; and (5) that the defendant participated in the enterprise through a pattern of racketeering activity by committing at least two racketeering (predicate) acts." Darden, 70 F.3d at 1518 (citation omitted). Defendants contend the evidence was insufficient on the elements of enterprise, pattern of racketeering activity and interstate commerce.

In reviewing the sufficiency of the evidence to support a jury verdict, the court views "the evidence in the light most favorable to the guilty verdict, giving the government the benefit of all reasonable inferences that might be drawn from the evidence." Darden, 70 F.3d at 1517 (quoting, United States v. Fregoso, 60 F.3d 1314, 1322 (8th Cir. 1995)). "We will reverse a conviction for insufficient evidence and order the entry of judgment of acquittal only if no construction of the evidence exists to support the jury's verdict." Id. We will address the sufficiency of the evidence as to the elements of enterprise, pattern of racketeering activity and interstate commerce.

### a. Enterprise

Three elements are necessary to establish the existence of a RICO enterprise: "(1) a common purpose; (2) a formal or informal organization of the participants in which they function as a unit ('some continuity of both structure and personnel'); and (3) 'an ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering activity.'" Darden, 70 F.3d at 1520 (citation omitted); and Nabors, 45 F.3d at 240. Defendants argue the proof is insufficient to establish the third element. The inquiry under the third element is "whether the enterprise encompasses more than what is necessary to commit the predicate RICO offense." Diamonds Plus, Inc. v. Kolber, 960 F.2d 765, 770 (8th Cir. 1992). In making this inquiry, the court may consider the facts used to support the predicate acts. Id. "Our focus is to ensure that RICO's severe penalties are limited to 'enterprises consisting of more than simple conspiracies to perpetrate the predicate acts of racketeering.'" United States v. Davidson, 122 F.3d 531, 534 (8th Cir.) (quotation omitted), cert. denied, ___ U.S. ___, 118 S.Ct. 639 (1997).

Defendants contend the proof fails as a matter of law to prove that an enterprise existed distinct, separate and apart from the racketeering activity. We disagree. The evidence viewed most favorably toward the guilty verdicts demonstrates that Nabors led a "small but prolific crime ring," Davidson, 122 F.3d at 534, which had a distinct structure consisting of more than simple conspiracies to perpetrate the predicate acts with which each defendant was convicted. Nabors participated in and directed Keltner's, Billy Keltner's and other individuals' activities in several burglaries, robberies and other crimes preceding the Tulsa bank robbery. Billy Keltner's statement to the FBI reflects that Nabors was the individual in charge during the commission of such crimes. The victims of the Tulsa bank robbery testified Nabors was clearly in charge during the commission of that offense. Bill Anderson testified that Nabors was the man in charge during the robbery of his home. Many of the items stolen during the robberies were used in subsequent robberies. Specifically, several items previously

stolen were used in the Tulsa bank robbery including parts of microphones used to make a fake bomb and police scanners. Nabors and Keltner also committed several acts of intimidation and solicitation of perjury to protect their identity.

### b. Pattern of Racketeering Activity

"A pattern of racketeering activity consists of at least two predicate acts, although two may not be sufficient [to prove such a pattern]." Darden, 70 F.3d at 1525 (citation omitted). The Supreme Court explained "to prove a pattern of racketeering activity a plaintiff or a prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." H.J. Inc., 492 U.S. at 239. The predicate acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." Id. at 240 (citation and quotation marks omitted). Continuity may refer either to a "closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." Id. at 241. Even if the predicate acts do not extend over enough time to establish closed-ended continuity, "the predicates will meet the definition of open-ended continuity to the extent they 'involve a distinct threat of long-term racketeering activity.'" Handeen v. Lemaire, 112 F.3d 1339, 1352-53 (8th Cir. 1997) (quoting, H.J. Inc., 492 U.S. at 242).

In this case, the ten predicate acts of which the jury convicted the defendants were related. Several of the items taken by defendants during the robberies were used in subsequent robberies and the Tulsa bank robbery, including microphones, walkie talkies, firearms, a police scanner and a police scanner guide. Jewelry taken by defendants during the robberies was transported across state boundaries, which served as the basis for their convictions for interstate transportation of stolen property. Several of defendants' victims testified that Nabors was the individual in charge and directed the activities of the other individuals during the commission of such crimes. The

-10-

defendants' criminal activity progressed from burglary of unoccupied structures, to robberies of owner-occupied homes, to kidnaping, to attempting to extort $1 million from a bank. Defendants' progressing criminal activity became more complex, requiring significant planning to avoid detection by law enforcement.

Defendants contend there was only one alleged scheme to rob a bank or extort monies, and the government, therefore, failed to establish a pattern of racketeering activity. This argument relates to the continuity element and is precluded by the Supreme Court's statement that "... it is implausible to suppose that Congress thought continuity might be shown *only* by proof of multiple schemes." H.J. Inc., 492 U.S. at 240. In this case, it is clear that Nabors' and Keltner's conduct involved the distinct threat of long-term racketeering activity. We find sufficient evidence to support the jury's finding that defendants engaged in a pattern of racketeering activity.

### c. Interstate Commerce

Defendants contend the proof failed to show the alleged enterprise affected interstate commerce. We find sufficient evidence in the record to establish this element of the offense. Both defendants made repeated trips between Arkansas, Oklahoma, Texas and Louisiana. Three of the predicate acts occurred outside the state of Arkansas: the Tulsa bank robbery, interstate transportation of stolen property, wire fraud and mail fraud.

## B.   Admissibility of Evidence Claims

Defendants contend the District Court erred in the evidentiary rulings discussed below. "We review the evidentiary rulings of a district court only for abuses of discretion, and will reverse only when an improper evidentiary ruling affects the substantial rights of the defendant or when we believe that the error has had more than

a slight influence on the verdict." United States v. Ballew, 40 F.3d 936, 941 (8th Cir. 1994) (citations omitted), cert. denied, 514 U.S. 1091 (1995).

## 1. Billy Keltner's Statement of February 25, 1991

The District Court allowed the admission of the FBI 302 report produced following the FBI's interview with Billy Keltner on February 25, 1991. Defendants object to the admission of this statement on the grounds that it was hearsay, it was admitted in violation of the Confrontation Clause of the Sixth Amendment, and it was the result of an unlawful bounty hunting agreement in violation of the Fifth Amendment's Due Process Clause.

Defendants objected to the FBI 302 report on hearsay grounds. The District Court held the statement was against Billy Keltner's penal interest and was admissible under Fed.R.Evid. 804(b)(3). We review this evidentiary ruling for abuse of discretion. Ballew, 40 F.3d at 941. Defendants contend this statement lacks the "circumstantial guarantees of trustworthiness" necessary for its admission. Nabors claims Billy Keltner was offered release from a 10-year-prison sentence in Texas and immunity for two robberies and other crimes for his statement and cooperation. Defendants assert Billy Keltner's statement was not trustworthy as it was contradicted by other evidence, including the testimony of Terry Don Leach. Defendants also claim the portion of the statement relating to the future crime in Oklahoma was not against Billy Keltner's penal interest because it did not incriminate him. Keltner urges this Court to find that an accomplice's statement which inculpates another individual is a subcategory of statements against penal interest and is not a firmly rooted hearsay exception.

Admission of hearsay statements may be allowed under Rule 804(b)(3) if the following three elements are met:

> (1) the declarant must be unavailable to testify at trial, (2) the statement must tend to subject the declarant to criminal liability to such an extent

-12-

that no reasonable person in his position would have made the statement unless he believed it to be true, and (3) the statement must be supported by corroborating circumstances clearly indicating the trustworthiness of the statement.

United States v. Bobo, 994 F.2d 524, 528 (8th Cir.) (quoting United States v. Seabolt, 958 F.2d 231, 233 (8th Cir. 1992), cert. denied, 507 U.S. 971 (1993)), cert. denied, 510 U.S. 891 (1993). In this case, Billy Keltner was unavailable to testify at trial because he committed suicide prior to the trial. The statement at issue provides details of criminal activity in which Billy Keltner participated and was planning to participate with various individuals, including both defendants. The statement includes information regarding five of the predicate racketeering acts charged in this case: (1) the details of the Anderson robbery, including a description of the items stolen from Anderson's home; (2) the details of the Anderson kidnaping; (3) the details of the Johnson robbery, including specific descriptions of jewelry stolen from Johnson's home; (4) the details of the transportation of stolen jewelry across state lines; and (5) the details of the conspiracy to rob or extort $1 million from a bank in Tulsa, Oklahoma. These statements clearly subjected Billy Keltner to criminal liability. The agreement between Billy Keltner and the Texas authorities provided that if his information lead to the "arrest and/or indictment" of Nabors, the authorities would not pursue a motion to revoke Billy Keltner's probation. Trial Exhibit 175. Contrary to defendants' argument, the agreement did not provide immunity to Billy Keltner for his role in any criminal activity, including the Anderson and Johnson robberies. Trial Exhibit 175.

The information Billy Keltner gave to the FBI was supported by corroborating circumstances. Billy Keltner's description of the robbery or extortion of a Tulsa bank being planned matches almost exactly the manner in which the crime was actually committed just four months after Billy Keltner gave his statement to the FBI. Billy Keltner informed the FBI that the bank president and his wife would be kidnaped and they would hold the wife hostage while requiring the bank president to retrieve $1

million from the bank. During the robbery they would use some of the microphones they had obtained during a robbery of an electronics store and walkie talkies they had stolen from a Radio Shack store to facilitate communication among the participants. Nabors was to furnish a necklace with speakers so the participants in the crime could listen to what was happening inside the bank. A metal box, which could be hung around the bank president's throat, was being constructed to amplify the speakers.

Mr. Foster's and Ms. Perkins' identifications of the defendants at trial as well as their descriptions of the manner in which the crime was committed provide additional corroboration of Billy Keltner's statement to the FBI regarding the Tulsa bank robbery. Other portions of Billy Keltner's statement were supported by evidence introduced at trial and corroborating testimony from the victims of the other robberies. We find no abuse of discretion by the District Court in admitting the February 25, 1991 FBI 302 report of the FBI's interview with Billy Keltner as a statement against penal interest.

Defendants' argument that the Sixth Amendment was violated by the admission of the FBI 302 report lacks merit. In examining the reliability of hearsay statements in conjunction with the Confrontation Clause, the Supreme Court stated:

> [W]hen a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception.

Ohio v. Roberts, 448 U.S. 56, 66 (1980); see also, White v. Illinois, 502 U.S. 346, 356 & n. 8 (1992) (recognizing that firmly rooted exceptions to the hearsay rules of evidence carry sufficient indicia of reliability to satisfy the reliability requirement of the Confrontation Clause), and Stidum v. Trickey, 881 F.2d 582, 584-85 (8th Cir. 1989), cert. denied, 493 U.S. 1087 (1990). As discussed above, Billy Keltner's statement to the FBI was properly admitted pursuant to Fed.R.Evid. 804(b)(3) as a statement against

his penal interest. Statements against penal interest fall within a firmly rooted hearsay exception. Berrisford v. Wood, 826 F.2d 747, 751 (8th Cir. 1987), cert. denied, 484 U.S. 1016 (1988). Therefore, the reliability requirements of the Confrontation Clause were satisfied and the admission of Billy Keltner's statement to the FBI did not violate the Confrontation Clause of the Sixth Amendment.

Defendants maintain the agreement between Billy Keltner and the FBI was an illegal "bounty hunting" agreement and the statement should not have been admitted because it violated defendants' due process rights to a fair trial. We disagree. The agreement between Billy Keltner and the FBI stated he was to provide truthful information to the FBI. If such information led to the arrest and indictment of the targeted individual (Nabors), the State of Texas and the prosecutor's office would recommend to the appropriate judge that Billy Keltner remain on probation and the Motion to Revoke Probation be dismissed. The portion of the agreement which referred to Billy Keltner's testimony before a grand jury or in court was eliminated prior to signing the agreement because he refused to provide such testimony.

Billy Keltner's agreement with the FBI and the State of Texas amounted to a contingent plea agreement. A panel of this Court found in United States v. Irons, 53 F.3d 947, 948-49 (8th Cir. 1995), that an agreement similar to the one at issue did not violate a defendant's right to a fair trial. As in Irons, the agreement here required Billy Keltner to provide truthful information. Id. at 948. The agreement did not grant immunity to Billy Keltner for criminal activity of which he informed the FBI and did not release him from the terms of his probation. Similar to the agreement in Irons, the favorable treatment Billy Keltner was to receive under the agreement in this case was not contingent on convicting Nabors. Id. The jury was fully informed about the agreement (it was admitted as Exhibit 175 at the trial), and the jury could determine whether Billy Keltner's information was credible. Id.

## 2. Billy Keltner's Grand Jury Testimony

The District Court excluded Billy Keltner's October 3, 1991 testimony before a grand jury, which defendants state they offered during the trial. Defendants contend the District Court abused its discretion in refusing the admission of this evidence, because defendants were not allowed to develop their theory of defense that Billy Keltner fabricated evidence against them. Defendants claim the District Court failed to specifically make a finding as to the reliability and admissibility of Billy Keltner's October 1991 grand jury testimony. We disagree.

Although defendants state they offered the grand jury testimony during the trial, defendants did not provide a citation to the record where such offer was made. We did not locate such offer in the record. Rule 28(e) of the Federal Rules of Appellate Procedure states in relevant part, "[i]f reference is made to evidence the admissibility of which is in controversy, reference shall be made to the pages of the appendix or of the transcript at which the evidence was identified, offered, and received or rejected." Even assuming the defendants offered the grand jury testimony, we are confident the District Court's ruling excluding such testimony was proper.

Prior to trial defendants filed a motion in limine to exclude both Billy Keltner's grand jury testimony and the FBI 302 report discussed above. In granting defendants' motion to exclude the grand jury testimony, the District Court found it was not admissible as a statement against penal interest because the government had granted immunity to Billy Keltner in exchange for his testimony. The District Court further found the grand jury testimony was not admissible under Fed.R.Evid. 804(b)(5) because the testimony lacked the "particularized guarantees of trustworthiness" necessary for its admission under this rule. See United States v. Barrett, 8 F.3d 1296, 1300 (8th Cir. 1993). Contrary to defendants' argument, the District Court made a detailed finding as to the reliability and admissibility of this testimony. We find no

abuse of discretion in the District Court's exclusion of Billy Keltner's grand jury testimony.

### 3. Tome Objection

The Supreme Court held in <u>Tome v. United States</u>, 513 U.S. 150, 167 (1995), that Fed.R.Evid. 801(d)(1)(B) "permits the introduction of a declarant's consistent out-of-court statements to rebut a charge of recent fabrication or improper influence or motive only when those statements were made before the charged recent fabrication or improper influence or motive."

Defendants argue the District Court erred in allowing the government to question one of the government's witnesses, Terry Don Leach, about prior consistent statements made by Leach to the FBI and to two separate grand juries. These questions were allowed on redirect examination by the government after the defendants had cross-examined Leach about such statements and raised the issue of fabrication or improper influence or motive. Defendants contend Leach's motive to lie was obvious: Leach, accused of a crime, was avoiding prosecution by cooperating with the authorities and by incriminating the defendants. Defendants assert the consistent statements at issue were made *after* Leach's motive to lie or fabricate had arisen, and therefore, the District Court erred in overruling defendants' <u>Tome</u> objection.

The government argues the rule at issue here is the rule of completeness, Fed.R.Evid. 106, rather than the Supreme Court's rule in <u>Tome</u>. The government contends the questions posed to Leach on redirect examination consisted of asking him about portions of the statements which the defendants omitted during cross-examination. We agree with the government's position and find no abuse of discretion in allowing such questions by the government on redirect examination.

-17-

## C.      Brady and Jencks Act Issues

Defendants assert the government violated <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), by refusing to comply with defendants' requests for copies of FBI Agent Handley's 302 reports relating to Billy Keltner. Defendants also contend they sought the FBI 302 reports under the Jencks Act, 18 U.S.C. § 3500 et seq., and failure to provide such information should result in a new trial.

During trial, Agent Handley testified he documented in at least three FBI 302 reports that Billy Keltner refused to testify in any court proceedings because he was afraid of Nabors and family members were involved in the criminal activities being investigated. Although defendants received the February 25, 1991 FBI 302 report discussed above, defendants stated at trial that they had not received any FBI 302 report documenting Billy Keltner's alleged fear of Nabors. Agent Handley testified that to his knowledge all of the FBI 302 reports authored by him were provided to the defendants. Upon requesting such reports, the District Court directed defendants to raise the issue outside the presence of the jury. Defendants thereafter failed to request that the District Court consider the issue of the FBI 302 reports. Defendants did not include this issue in their motions for a new trial. During defendants' request at trial for the additional FBI 302 reports concerning Billy Keltner, defendants did not state the issue as being whether the government violated the principles set forth in <u>Brady</u>, 373 U.S. at 87. Defendants failed to obtain a ruling on this issue by the District Court. The <u>Brady</u> issue has not been preserved for appellate review. <u>See</u> <u>United States v. Wagoner</u>, 713 F.2d 1371, 1374 (8th Cir. 1983) (holding "[i]t was incumbent upon [the defendant] to obtain a ruling upon his motion [to exclude evidence] and having failed to do so leaves nothing for review."); and <u>United States v. Payne</u>, 102 F.3d 289, 292-93 (7th Cir. 1996) (holding that defendant waived his <u>Brady</u> argument with respect to agent's debriefing notes by failing to give the district court the opportunity to review the notes before taking an appeal, despite defendant's request that the matter be preserved for appeal).

Even if defendants had properly preserved their Brady claim for review, it is without merit. In Brady, the Supreme Court stated that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. To establish a Brady violation, a defendant is required to show that: (1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material. United States v. Van Brocklin, 115 F.3d 587, 594 (8th Cir. 1997), cert. denied, ___ S.Ct. ___, 1998 WL 245059 (U.S. May 18, 1998) (No. 97-1670). To establish materiality in the context of Brady, "the accused must show there is a reasonable probability that if the allegedly suppressed evidence had been disclosed at trial the result of the proceeding would have been different." Drew v. United States, 46 F.3d 823, 827-28 (8th Cir.) (citations omitted), cert. denied, 516 U.S. 817 (1995). "A 'reasonable probability' is a probability sufficient to undermine the reviewing court's confidence in the outcome of the proceeding." Id. (citation omitted).

Defendants have not shown any of the elements necessary to succeed on a Brady claim. The record before the District Court on the suppression issue is insufficient to show the prosecution suppressed the FBI 302 reports at issue. Even if they were suppressed, defendants have failed to show the FBI 302 reports documenting Billy Keltner's fear of Nabors were "favorable" to them. Defendants allege such reports may "lead to other materials buried somewhere within the FBI." Defendants further contend such reports are crucial to the defense regarding the issue of governmental misconduct. "Mere speculation that materials may contain exculpatory evidence is not, however, sufficient to sustain a Brady claim." Van Brocklin, 115 F.3d at 594.

Moreover, defendants have not satisfied the materiality element. The defendants have not shown there is a reasonable probability that the result of the trial would have been different had the FBI 302 reports documenting Billy Keltner's fear of Nabors been disclosed to them. Defendants do not specify how such reports may have affected the

-19-

outcome of the trial. We therefore hold the defendants have failed to establish a <u>Brady</u> violation.

Regarding their Jencks Act claim, defendants failed to object at trial on the grounds that the alleged failure to provide the FBI 302 reports at issue amounted to a Jencks Act violation. Defendants did not raise this issue in their motions for a new trial. Defendants have waived this argument and we need not address it here. <u>See</u> <u>United States v. Grajales-Montoya</u>, 117 F.3d 356, 363 (8th Cir.) (holding that failure to advance an argument before the district court that a Jencks Act violation occurred results in waiver of the argument on appeal), <u>cert. denied</u>, ___ U.S. ___, 118 S.Ct. 586 (1997).

## D.    Remaining Issues

In addition to the issues addressed above, the defendants have raised and briefed several other issues. These issues include arguments that (1) the Fourth Amendment and 18 U.S.C. § 3109 were violated by the failure to "knock and announce" in the execution of a search warrant; (2) the evidence was insufficient to sustain Nabors' convictions of mail and wire fraud and possession of a stolen firearm; (3) the evidence was insufficient to sustain defendants' convictions of interstate transportation of stolen property; (4) the jury should have been instructed on the law relating to illegal bounty hunting agreements; (5) defendants are entitled to a new trial based on the decision in <u>Old Chief v. United States</u>, 519 U.S. 172 (1997); (6) defendants are entitled to a new trial due to outrageous governmental conduct; and (7) the District Court erred in refusing re-cross-examination of Ms. Perkins after her identification of both defendants. We have carefully considered all arguments on these issues and have reviewed the relevant portions of the record. Each of these claims is without merit. The District Court's rulings on the issues listed above are affirmed.

## III.  CONCLUSION

For the reasons stated herein, we affirm the District Court's judgments as to both defendants.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.