UNITED STATES of America,

v.

Carl COOPER, Defendant.

No. Crim. 99–0266(JHG).

United States District Court, District of Columbia.

Feb. 29, 2000.

Kenneth Leonard Wainstein, U.S. Attorney's Office, Washington, DC, for U.S.

Steven R. Kiersh, Washington, DC, Francis Darron Carter, Washington, DC, for Carl Cooper, Defendant.

### MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

The 48–count indictment charging defendant, Carl Cooper ("Cooper"), with various racketeering acts of robbery, murder, conspiracy and firearms offenses was filed on August 4, 1999, and a jury trial is scheduled to commence May 2, 2000. The government is seeking the death penalty for three eligible offenses. Numerous motions· have been filed in this case. By Memorandum Opinion and Order dated February 1, 2000, this Court denied Cooper's motions to suppress statements, wiretap interceptions, physical evidence, and photographic identification. See United States v. Cooper, 85 F.Supp.2d 1 (D.D.C.2000). Addressed in this Opinion are Cooper's motions challenging certain aspects of the indictment: (1) motion to dismiss the indictment for lack of a RICO enterprise; (2) motion to strike those counts of the indictment pertaining to the murder and robbery of Sandy Griffin on the grounds those charges are not part of a pattern of racketeering activity; (3) motion to sever the Starbucks murder counts from the indictment on the grounds of prejudice and lack of a pattern of racketeering activity; (4) motion for in camera review of grand jury testimony to determine existence of an enterprise; and (5) motion for pretrial hearing to determine the existence of a conspiracy.

On January 19, 2000, the Court heard argument from defense counsel on the motion to dismiss the indictment as to the robbery and murder of Sandy Griffin, and the motion to sever all counts relating to the Starbucks murders. Defense counsel submitted on the papers as to the remaining motions. The government presented argument on its entire RICO theory, including the Sandy Griffin and Starbucks counts. Based on the pleadings filed by the parties, the argument given in open Court, and all matters considered, for the reasons discussed below, each of Mr. Cooper's motions is denied.

### I. Background

The government submitted a factual proffer in its omnibus opposition to defense motions concerning the RICO charges in the indictment. The following is based on that proffer.

The government alleges that Cooper, Cooper's childhood friend James,[1] and a man named Earnest who Cooper met in the early 1990's "became the nucleus of the racketeering enterprise" and, "[b]y 1993, these men had formed a robbery ring that continued for the next six years." Govt. Opp. at 7.[2] Other individuals were allowed

---

1. The Court will usually follow the government's policy of using only first names to protect those individuals.

2. The government states it has an audiotape containing a February 28, 1999 conversation between Cooper and Earnest (who was wearing a body-recorder given to him by law enforcement officials), wherein Cooper describes his relationship with James and Earnest and complains that their friend Hayley has been 'snitching:' "I fucked up because I allowed [Hayley] in ... Because it was me and Man [James]. Then it was—and then Man was out of the picture for while. It was me and you ... Then Man came back in the picture ... So it was all three—then it was me, you and Man. But then I allowed her into the circle, as well. And that was

in the group from time to time. The government argues Cooper was the leader and primary decision-maker of the group, deciding which individuals and establishments to target for robberies and coordinating the plans to carry out the criminal activities. The government intends to introduce evidence of charged and uncharged predicate acts to prove the existence of a RICO enterprise and a pattern of racketeering activity.[3] These acts are summarized below in chronological order.

### A. Armed Robbery and Murder of Sandy Griffin

The first alleged racketeering act is the May 10, 1993 armed robbery and murder of Sandy Griffin ("Griffin"). The government contends that Cooper and Earnest were driving by an apartment building when they noticed a security guard, later identified as Sandy Griffin, on duty in the lobby. Cooper and Earnest wanted to rob Griffin of his gun so that Earnest could use the gun in future robberies. Earnest acted as the look-out while Cooper went inside. Cooper wore a .green army mask over his face, pointed a .32 caliber revolver at Griffin and told him not to move. When Griffin reached for his gun, Cooper shot him in the head and fled the scene with Griffin's gun. The government states that it recovered the mask from a search of Cooper's residence, and that the .32 caliber gun may have been the same gun found on the scene of the Officer Howard shooting, discussed *infra*, at § IE. Cooper gave a written statement concerning his involvement in the Griffin robbery and shooting. *See Cooper*, 85 F.Supp.2d at 16–17. He has been charged in the indictment with first-degree premeditated murder and first-degree felony murder in connection with this incident.

### B. 1993 Uncharged Robbery in Bladensburg, Maryland

On an unspecified date in 1993, the government alleges Cooper and Earnest were driving in Bladensburg, Maryland when Cooper decided to rob a man they noticed in a parking lot. Cooper jumped out of the car, held a gun to the man's face, forced him to lie on the ground, and stole a gold necklace from around his neck. He and Earnest then fled the scene with the necklace. Cooper has not been charged in the indictment with this robbery.

### C. Uncharged Robbery and Shooting on Bladensburg Road

On an unspecified date in 1995, the government alleges Cooper and James decided to rob a gas station in Maryland. In preparation for the robbery, they stole a truck to use as the getaway vehicle and left it parked in a parking lot near Bladensburg Road.[4] They checked on the vehicle a few days later and noticed a man inside. Cooper and James drew their guns and approached the man. Cooper noticed the man had money in his pockets and Cooper told James to take the money. However, the man ran away before James could do as instructed. Cooper and James chased the man, shot him in the leg and fled the scene. Cooper has not been charged in the indictment with this robbery.

### D. Armed Robbery of Pizza Italia

The government alleges that on the evening of June 4, 1996, Cooper, Earnest, James and James' girlfriend Hayley planned to rob the Pizza Italia in Maryland. The group gathered guns, masks,

---

my mother fucking downfall." Govt.Opp. at 8 (brackets in original).

**3.** Uncharged criminal acts, while not admissible as RICO predicates, may be relevant and admissible to prove other RICO elements. *See United States v. Gonzalez*, 921 F.2d 1530, 1546 (11th Cir.1991); *United States v. Davi-*

*doff*, 845 F.2d 1151, 1156 (2d Cir.1988); *United States v. Ellison*, 793 F.2d 942, 949 (8th Cir.1986).

**4.** The government does not state whether the vehicle was parked near Bladensburg Road in the District of Columbia, or whether it was parked in Maryland.

and gloves, and stole a car. Hayley stayed in the stolen car while Cooper, Earnest and James went inside. The three pulled their guns and led the employees into the service area. They pistol-whipped the manager, and stole money both from the cash register and from the employees' pockets. After the robbery, they abandoned the stolen vehicle and split up the proceeds. Cooper gave a written statement admitting he stole a car for James and Hayley, but denying any knowledge or participation in the robbery. *See Cooper,* 85 F.Supp.2d at 13. In connection with this incident, Cooper has been charged in the indictment with conspiracy to interfere with commerce by robbery, interference with commerce by robbery, use of a firearm during a crime of violence, carrying a pistol without a license, and unlawful possession of a firearm and ammunition by a convicted felon.

### E. Armed Robbery and Shooting of Officer Howard

The government alleges that on August 12, 1996, in Prince George's County, Maryland, Cooper, Earnest and another man came upon an individual, later identified as off-duty Prince George's County police officer Bruce Howard, having a sexual encounter with a woman in a parked automobile. Earnest and the other man stayed behind as Cooper approached the car, pointed a gun at Officer Howard and the woman, and demanded money. Officer Howard showed some resistance, a scuffle ensued, and Cooper shot Officer Howard. Cooper used a .9 mm handgun to shoot Officer Howard, but dropped a .32 caliber handgun at the scene. The police have recovered both the .32 caliber handgun and the .9 mm handgun. Cooper gave a written statement concerning his involvement in this crime. *See Cooper,* 85 F.Supp.2d at 12. In connection with this incident, he has been charged with armed robbery, assault and attempted murder in aid of racketeering activity, use of a firearm during a crime of violence, carrying a pistol without a license, and unlawful possession of a firearm and ammunition by a convicted felon.

### F. Robbery of the Velvet Touch Massage Parlor

The government alleges that on September 8, 1996, Cooper, James, Earnest and Hayley robbed Hayley's former employer, the Velvet Touch Massage Parlor in Harrisburg, Pennsylvania. Hayley drove the getaway vehicle, and Cooper, James and Earnest armed themselves with guns and went inside. The three men stole a .22 caliber pistol and cash. On their way out, Cooper grabbed the videotape from the security camera. The government later recovered the videotape during a search of Cooper's residence.[5] Cooper gave a written statement concerning his involvement in this crime, stating that he acted as the lookout while James pulled a gun and robbed the place. *See Cooper,* 85 F.Supp.2d at 13. In connection with this incident, Cooper has been charged with assault with a dangerous weapon in aid of racketeering activity and use of a firearm during a crime of violence.

### G. Robbery of Chevy Chase Bank

The government alleges Cooper helped plan, but did not participate in, a robbery on October 1, 1996 at the Chevy Chase Bank in Bethesda, Maryland. James' "play-sister" worked as a teller at the bank and James persuaded her to help him rob the bank. Cooper, James, Hayley and two other friends then gathered in Cooper's house and formulated a plan whereby James would dress up as a woman and walk up to the play-sister's window with a demand note. Cooper composed the note, which threatened the existence of explosives and demanded cash.[6] Cooper also

---

**5.** The videotape stopped recording before Cooper and the others went inside the massage parlor, but the government claims it is unquestionably the stolen videotape.

**6.** According to the indictment, the note said: "There is a bomb in this bag [sic] it is full of

gave James a skirt belonging to Cooper's wife to wear as part of the disguise. Hayley and James carried out the robbery a day or two later. After the robbery, Hayley and James met with Cooper and Earnest and split the robbery proceeds of approximately $11,000.00.[7] Cooper gave a written statement concerning this incident, but detailed a different account. He stated he did not help plan the robbery, and did not know Hayley and James intended to commit the robbery. He acknowledged that Hayley and James gave him some money, but claimed it was because he let them stay at his house. *See Cooper*, 85 F.Supp.2d at 13. Cooper has been charged in the indictment in connection with this incident with conspiracy to commit bank robbery, bank robbery, theft from a bank, receipt of money stolen from a bank, carrying a pistol without a license, and unlawful possession of a firearm by a convicted felon.[8]

### H. Robbery of a Community Center

The government alleges that on June 26, 1997, Cooper and Earnest robbed the Rollingcrest–Chillum Community Center in Hyattsville, Maryland. Earlier on the day of the robbery, Earnest noticed employees counting money behind the counter, reported to Cooper what he had seen, and suggested they rob the place. Cooper agreed, and he and Earnest returned to the Center with their guns. Earnest stayed in the car while Cooper went inside. Cooper pointed the gun at the employees and waited while they filled a bag with money.[9] Once the money was obtained, Cooper left the scene, drove off with Earnest, and the two shared the proceeds. A

witness to the robbery identified Cooper from a photo spread. *See Cooper*, 85 F.Supp.2d at 34–35. Cooper has been charged in the indictment in connection with this incident with conspiracy to interfere with commerce by robbery, interference with commerce by robbery, use of a firearm during a crime of violence, carrying a pistol without a license, and unlawful possession of a firearm and ammunition by a convicted felon.

### I. A Attempted Robbery and Triple Murder at Starbucks

The government alleges that Cooper and Earnest planned to rob the Starbucks in Georgetown. In the morning of July 6, 1997, Cooper went to the Starbucks to make sure it was doing a brisk business. Cooper decided to rob the store that evening. He attempted to reach Earnest but, when unsuccessful, went to the Starbucks alone. He entered the store carrying two guns and told the three employees present (the manager and two others) that he was robbing the place. Cooper asked for the keys to the safe, but the manager would not comply so Cooper fired a warning shot into the ceiling. A struggle then ensued, and Cooper shot and killed the manager and the other two employees. Cooper ran out of the store without taking anything. Cooper gave three written statements concerning his involvement in this incident. *See Cooper*, 85 F.Supp.2d at 14–15, 17–18. He has been charged in the indictment in connection with this incident with conspiracy to interfere with commerce by robbery, attempted interference with commerce by robbery, second-degree burglary while armed, three counts of attempted

---

C–4 explosives, give me all the money out of the bottom drawer, make it slow and easy like I am making a transaction; alert anybody and we all die!" Indictment at 23.

7. The government's proffer states the amount as approximately $11,000.00. The indictment lists the amount as $11,900.00.

8. The government states that the firearms offenses are included in the indictment because

witnesses recalled Cooper had a gun "that night." Govt.Opp. at 16, n. 4. It is unclear whether Cooper had the gun when he allegedly planned the robbery, or when the group allegedly met to split up the robbery proceeds.

9. The indictment states that Cooper received approximately $5,000 in stolen proceeds. *See* indictment at 28.

robbery, three counts of first-degree premeditated murder, three counts of first-degree felony murder, three counts of murder in the course of using a firearm during a crime of violence, carrying a pistol without a license, and unlawful possession of a firearm and ammunition by a convicted felon.

### J. Conspiracy to Rob Tire Shop and Hair Salon

The government alleges that on a date between August and October, 1997, Cooper, Earnest and another individual named Eric planned to rob Tire Town in Beltsville, Maryland. Earnest had gotten his car repaired there and claimed he knew where the store kept its money. The three individuals gathered at Cooper's house and armed themselves with weapons. However, when they drove to the store, Cooper noticed an ATM machine with a security camera within range of the tire shop. Cooper called off the robbery because he was concerned the group would be captured on videotape. The group then decided to rob the Salon En Vogue, in Hyattsville, Maryland, where Earnest got his hair done. They drove to the hair salon, but Cooper again called off the robbery when he noticed a police car in the parking lot. In connection with this incident, Cooper has been charged with conspiracy to interfere with commerce by robbery, use of a firearm during a crime of violence, carrying a pistol without a license, and unlawful possession of a firearm by a convicted felon.

### K. Uncharged Attempted Robbery of a Drug Dealer

The government alleges that in late 1997 or early 1998 Cooper and a woman named Kelly planned to rob and shoot a drug dealer. Kelly had complained to Cooper that she had some type of confrontation with this drug dealer and wanted to "even the score." Cooper and Kelly waited for several hours outside the drug dealer's home, but he never showed up so they left without incident. Cooper has not been charged in the indictment in connection with this incident.

### L. Uncharged Attempted Robbery of a Laundromat

The government alleges that in late 1997 or early 1998 Cooper and Kelly planned to rob a laundromat. Kelly had been doing her laundry at this laundromat and noticed that the establishment retained a substantial amount of cash on the premises and had no apparent security. She reported her observations to Cooper and suggested they rob the place. Cooper agreed and planned for Kelly to drive the getaway car while Cooper went inside and committed the robbery. However, Cooper decided to drive past the laundromat first to ensure there would be no security problems. He noticed a police station a short distance from the laundromat and abandoned the plan because of possible police traffic. Cooper has not been charged in the indictment in connection with this incident.

## II. Discussion

Cooper has been charged with RICO violations under 18 U.S.C. § 1962(c), which makes it "unlawful for any person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." The statute contains two separate and distinct elements: a pattern of racketeering activity and the existence of an enterprise.

### A. Existence of An Enterprise

A RICO enterprise is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). In other words, the "enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette,*

452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). It encompasses not only legitimate enterprises, but also criminal participation in an association that performs only illegal acts. *See id.* "The existence of an enterprise at all times remains a separate element that must be proved by the government." *See id.* at 583, 101 S.Ct. 2524.

Cooper has filed a Motion to Dismiss the Indictment for Failure to Allege RICO Enterprise Sufficiently Distinct from the Predicate Acts. He argues the government has failed to establish the existence of an enterprise that is separate and distinct from the pattern of racketeering activity conducted by its members. He states

> [t]he indictment is nothing but an aggregation of events which have no commonality of purpose and which are not connected by organizational structure. The acts were performed by individuals acting on their own in an utterly chaotic manner. The United States is simply trying to bootstrap these disparate events together and dress them up as the byproduct of a formal organizational structure.

Mot. to Dismiss at 2.

■ As this Circuit has noted, the "same group of individuals who repeatedly commit predicate offenses do not necessarily comprise an enterprise. An extra ingredient is required: organization." *United States v. Perholtz,* 842 F.2d 343, 363 (D.C.Cir.1988). The *Perholtz* Court set forth a three-part test for determining whether an enterprise has been established: (1) a common purpose among the participants; (2) organization; and (3) continuity.

*1. Common Purpose*

■ The government alleges that Cooper and his confederates, James, Earnest, and others, committed crimes with the common purpose of "enrichment through robbery." Govt.Opp. at 33–34. It is clear an enterprise can be established through an informal group of people who come together for the common purpose of obtaining financial gain through criminal activity. *See United States v. Cagnina,* 697 F.2d 915, 921 (11th Cir.1983); *United States v. Elliott,* 571 F.2d 880 (5th Cir. 1978). *See also, United States v. Richardson,* 167 F.3d 621, 625 (D.C.Cir.), *cert. den.,* —— U.S. ——, 120 S.Ct. 225, 145 L.Ed.2d 189 (1999) (defendant did not claim the government failed to prove a common purpose because "[a]s the district court observed, the government presented 'undeniable' evidence that their common purpose was to 'obtain money or other property by robbery' ").

■ Here, the government asserts Cooper's group organized for the purpose of robbing money and other property and then "divided the spoils" of those robberies among the participants. For example, the participants split up the monetary and other proceeds from the robberies at the Chevy Chase Bank, the Pizza Italia, and the Community Center. Cooper and Earnest jointly undertook the robbery of Sandy Griffin for the purpose of stealing Griffin's gun for Earnest to use in future robberies. Moreover, Cooper and his group specifically targeted places they thought would have substantial cash on hand. The decision to rob the Community Center was made after Earnest reported to Cooper that he noticed employees counting cash at the Center. When Cooper and Earnest planned to rob the Starbucks, Cooper went into the store earlier on the day of the robbery to ensure that the shop was doing a brisk business. Cooper and Kelly planned to rob the laundromat after Kelly reported to Cooper that she noticed a substantial amount of cash on the premises. Sandy Griffin was robbed because Earnest needed a gun and Griffin had one. The man on Bladensburg Road was robbed when Cooper and James noticed the man had money in his pockets. Clearly, the government's proffered evidence, if proved, demonstrates that Cooper and his confederates arranged and planned

robberies with the common purpose of "obtain[ing] money or other property." *Richardson,* 167 F.3d at 625.

### 2. Organization

■ The government argues that Cooper's association-in-fact "enterprise was a rough hierarchy with Cooper acting as the leader of the group." Govt.Opp. at 37. Cooper argues the individuals involved all acted on their own in a "chaotic" manner and, if the government's view prevails, it would "suggest that any two or more people who rob stores more than twice with anything more than an idiotic level of planning will be engaged in a RICO enterprise." Reply to Govt.Opp. at 3.

There has been some disagreement among the circuits as to what level of structure or organization must exist before an entity qualifies as a RICO enterprise. The majority view, which does not include the District of Columbia Circuit, is that the RICO enterprise must have an ascertainable structure distinct from that inherent in the conduct of racketeering activity. *See, e.g., Chang v. Chen,* 80 F.3d 1293 (9th Cir.1996); *United States v. Sanders,* 928 F.2d 940 (10th Cir.1991); *Manax v. McNamara,* 842 F.2d 808 (5th Cir.1988); *United States v. Neapolitan,* 791 F.2d 489 (7th Cir.1986); *United States v. Tillett,* 763 F.2d 628 (4th Cir.1985); *United States v. Riccobene,* 709 F.2d 214 (3d Cir.1983); *United States v. Bledsoe,* 674 F.2d 647 (8th Cir.1982). Under the majority view, an enterprise must exhibit "some sort of structure ... for the making of decisions, whether it be hierarchical or consensual.... The function of overseeing and coordinating the commission of several different predicate offenses and other activities on an on-going basis is adequate to satisfy the separate existence require-

ment." *Chang,* 80 F.3d at 1299 (citing *Riccobene,* 709 F.2d at 223–24).

The District of Columbia Circuit, along with the Second Circuit and the Eleventh Circuit, reject the majority view.[10] In *Perholtz,* the Court noted

> To the extent these courts [subscribing to the majority view] have held that the enterprise is not equivalent to the pattern of racketeering, we are in accord. The same group of individuals who repeatedly commit predicate offenses do not necessarily comprise an enterprise. An extra ingredient is required: organization. To the extent, however, these cases suggest that the organization cannot be inferred from the pattern (or even more, that the organization cannot exist unless it does something other than commit predicate acts), we cannot agree. *Turkette* specifically recognizes that the proof of the enterprise may 'coalesce' with the proof of the pattern, *i.e.,* that the different conclusions may be inferred from proof of the same predicate acts. 452 U.S. at 583, 101 S.Ct. 2524.

*Perholtz,* 842 F.2d at 363; *see also, United States v. White,* 116 F.3d 903, 924, n. 6 (D.C.Cir.1997) ("While many (but not all) of the indicia of the First Street Crew's organization are also part of its pattern of racketeering activity, evidence of a pattern of racketeering activity can establish the existence of an enterprise as well.").

Although Cooper acknowledges that in some situations proof of the predicate acts alone might be sufficient to establish organization, he claims this is not such a case. However, the Court need not decide whether the enterprise in this case is inherent from the pattern of activity because organization is demonstrated by the structure and operation of Cooper's enterprise as distinct from its pattern of activity.[11] According to the government, the group

---

**10.** *See Perholtz,* 842 F.2d at 363; *United States v. Hewes,* 729 F.2d 1302 (11th Cir. 1984); *United States v. Mazzei,* 700 F.2d 85 (2d Cir.1983).

**11.** Although this Circuit has not adopted the majority view, both the *Richardson* and the *White* Courts considered the structure and operation of the RICO organizations at issue as distinct from their patterns of activity.

always looked to Cooper for guidance; Cooper was their leader. If Cooper was with his associates and planned a robbery, or happened upon a robbery opportunity, it was Cooper who gave the group direction and decided how to proceed (or not to proceed due to police presence or other factors Cooper found troubling). If one of Cooper's associates considered a robbery opportunity, that associate went to Cooper to ask and receive his advice. It was Cooper who drove by or went into targeted establishments to ensure there were no security measures in place. It was Cooper who usually approached the victim while one of the other members of the group remained behind as the look-out person. The group took measures to avoid detection. They stole cars, wore masks and gloves, moved guns around from house to house and, in one instance, Cooper stole the videotape from a security camera. In some cases, the group would plan the best time to commit their crimes in order to ensure the maximum profit and reduce the encounter of potentially resisting victims. They shared the profits of their robberies. They stole a gun for Earnest to use in future robberies. The group members were friends and had close social ties. According to the government, James, Earnest and Cooper "were constant companions: they socialized together; they traveled together; they did firearm target practice together; they fought together; and they looked out for each other." Govt.Opp. at 45 (footnotes omitted). But they also discussed killing witnesses, law enforcement officers, and confederates who might identify a member of the organization. *See* Govt. Omnibus Opp. at 40.

This case is similar to *United States v. Richardson,* 167 F.3d 621 (D.C.Cir.), *cert. denied,* —— U.S. ——, 120 S.Ct. 225, 145 L.Ed.2d 189 (1999). *Richardson* involved three individuals who committed fifteen acts of armed robbery and murder over a three-month period. The Court found that sufficient organization existed to establish an enterprise:

To begin with, the evidence showed that Richardson and his co-defendants organized themselves hierarchically and planned their activities. According to trial witnesses, Cunningham served as the leader: He was usually the first through the door and first to display a firearm. He announced the robbery, gave orders to the victims, and directed Richardson and Barren during the course of the robberies. Additional evidence of organization and continuity comes from the robberies' consistent pattern; from testimony that Richardson and his codefendants borrowed or rented cars to commit their crimes and attempted to switch license plates to avoid detection; from ballistics analysis establishing that they used guns stolen in earlier crimes to facilitate later robberies and shootings; from testimony that they committed acts of violence and retaliation to protect their armed robbery enterprise; and from evidence that the three had social ties and were often seen together during the summer of 1993, thus further supporting the existence of an association independent of their individual crimes.

*Richardson,* 167 F.3d at 625.

A crime ring similar to the one in *Richardson* was upheld as a RICO enterprise in *United States v. Keltner,* 147 F.3d 662 (8th Cir.), *cert. den., Nabors v. United States,* 525 U.S. 1032, 119 S.Ct. 574, 142 L.Ed.2d 478 (1998). *Keltner* involved a "small but prolific crime ring" consisting of two main individuals and various other participants who committed acts of burglary, kidnaping and robbery over a course of a few months. Several victims testified that defendant Nabors was the individual in charge. Some of the items stolen during earlier robberies were used in later robberies, including microphones, police scanners, and firearms. The group also made efforts to hide their identity and to avoid detection. The Court found this suf-

ficient to establish a RICO enterprise. *See id.* at 668–669.[12]

Cooper strains to argue that *Richardson* involved more structure than is present here. He claims that every group has a leader, that every group tries to cover its tracks, and that every group tries to thwart law enforcement. Relying on *United States v. Korando,* 29 F.3d 1114 (7th Cir.1994), he claims organization for RICO enterprise purposes exists only when there is an established division of labor or decision-making structure. However, the enterprise in *Korando* is no more structured than that involved here. In fact, *Korando* supports the government's position. The *Korando* case involved a total of seven predicate acts of arson and murder, although the appellant was convicted of only one act of arson and two acts of agreeing to participate in arson. One member of the enterprise, a realtor, solicited individuals who agreed to allow their properties to be burned by Korando for the purpose of collecting insurance proceeds. The government argued the realtor was at the center of the "small outfit specializing in insurance fraud." *Id.* at 1116. Korando would burn the properties and the property owners would collect the insurance proceeds and split those proceeds with Korando and the realtor. In upholding the existence of an enterprise, the *Korando* Court held that "while there is not much of a structure, the division of labor ... does appear to exist." *Id.* at 1119. The *Korando* Court repeatedly em-

phasized that there need not be much structure to establish an enterprise, and that the government has a very low hurdle to meet. *Id.* 1117–1118. The low threshold is evident from the jury instruction upheld in *Perholtz:* "It is not necessary that the enterprise, if it existed, have any particular or formal structure but it must have sufficient organization that its members function and operated together in a coordinated manner in order to carry out the common purpose alleged." *Perholtz,* 842 F.2d at 363.

Cooper led his racketeering group, however small and informal, to act in an organized, concerted, and coordinated manner to carry out the common purpose alleged. The government's proffered evidence, if proved, could easily satisfy the low threshold for establishing structure and organization as distinct from the pattern of activity.

### 3. Continuity

▆ In order to establish continuity, there must be a "certain core of constant personnel." *United States v. Hoyle,* 122 F.3d 48, 51 (D.C.Cir.1997). Here Cooper, James and Earnest constitute the core personnel. Either Earnest or James was in some manner involved with Cooper in every charged predicate act. In the four uncharged acts, James and Earnest were involved in one each.

Cooper argues that continuity can not be established because the same participants

---

12. Cooper claims the analysis in *Keltner* is insufficient under an earlier Eighth Circuit case, *United States v. Davidson,* 122 F.3d 531 (8th Cir.1997). *Davidson* involved a "small but prolific crime ring" involving Davidson, Davidson's stepson and another individual. Davidson would instruct his stepson and the other individual to steal cars and burglarize homes. Davidson then resold the stolen goods. Davidson also instructed the others to burn cars and houses for insurance proceeds and intimidation, and also to supply drugs for Davidson to distribute. In addition, Davidson paid a fourth individual $5,000 to murder an informant who set up Davidson's stepson in a drug buy with an undercover police officer.

The Court upheld the existence of a criminal enterprise, noting "the activities of the group exhibit a pattern of roles and a continuing system of authority; the essential identity of the enterprise endured." *Id.* at 535. *Keltner* and *Davidson* are similar cases. Both cases involved a "small but prolific crime ring" that committed burglaries and other crimes. Both cases involved one individual who was clearly in charge. Even if Cooper is correct that "factually, the enterprise in *Keltner* could hardly be compared to the extensive crime ring in *Davidson,*" Reply at 14, that does not mean these two courts used different legal standards. Both cases are good law and are consistent with each other.

were not always involved in the same activities. However, it is not required that each participant in the enterprise remain in the group from beginning to end. *See United States v. Feldman*, 853 F.2d 648, 659 (9th Cir.1988), *citing United States v. Hewes*, 729 F.2d 1302, 1311 (11th Cir. 1984). The deviation in participants does not defeat the element of continuity as long as there is a core group of participants. *See Perholtz*, 842 F.2d at 354 ("Elements of continuity of structure and personnel were evident despite some changes in personnel between [racketeering acts], and despite the fact that every participant did not play an identical role in each [racketeering act]);" *Riccobene*, 709 F.2d at 223 (stating the continuity requirement "does not mean that individuals cannot leave the group or that new members cannot join at a later time ... [i]t does require, however, that each person perform a role in the group consistent with the organizational structure"); *United States v. Gonzalez*, 921 F.2d at 1530 ("That the many defendants and predicate crimes were different, or even unrelated, was now irrelevant, so long as it could be reasonably inferred that each crime was intended to further the enterprise.").

If proved, the government's proffered evidence could satisfy the continuity requirement, Cooper, James and Earnest were close friends who socialized and traveled together. When James moved to Pennsylvania, Cooper and James traveled between Pennsylvania and the District of Columbia to visit each other. They referred to each other as "brothers," and James lived with Cooper and his family for a period of time. *See* Govt. Omnibus Opp. at 45. In addition, the government describes incidents where Cooper, James and Earnest fought or were prepared to fight with other individuals to protect each other, and in retaliation for harm done to each other or their friends. *See id.* n. 12.

Thus, "[t]he intertwining of social and criminal activities permitted the group to function as a continuous unit with more than sporadic contacts." *United States v. Lemm*, 680 F.2d 1193, 1200 (8th Cir.1982). *See also, United States v. Masters*, 924 F.2d 1362, 1366 (7th Cir.1991) (criminal enterprises exhibit "informal relationships based on kinship and friendship"); *Davidson*, 122 F.3d at 535 (the group members had "family and social relationships that helped define a criminal RICO enterprise") (internal quotations and citations omitted).

### B. Pattern of Racketeering Activity and Counts Pertaining to Sandy Griffin

■ A "pattern of racketeering activity" is defined in 18 U.S.C. § 1961(5) as "at least two acts of racketeering activity" within a ten-year period. "A pattern is an arrangement or order of things or activity, and the mere fact that there are a number of predicates is no guarantee they will fall into any arrangement or order. It is not the number of predicates, but the relationship that they bear to each other or to some external organizing principle that renders them ordered or arranged." *H.J., Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 238, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) (internal citations and quotations omitted). In order to prove a pattern of racketeering activity, the government "must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *Id.* at 239, 109 S.Ct. 2893.

■ Cooper claims the robbery and murder of Sandy Griffin was not part of a pattern of racketeering activity. Griffin was robbed and murdered on May 10, 1993. The next predicate act for which Cooper is charged occurred more than three years later, on June 4, 1996.[13] Coo-

---

**13.** Cooper is alleged to have participated in two uncharged acts during the time period between the Griffin murder and the June

1996 incident. Cooper and Earnest are alleged to have robbed an individual of a gold necklace in 1993 (an exact date is not provid-

per's argument is three-fold. First, he claims the Griffin murder and robbery, which occurred in Maryland, has no connection to interstate commerce. However, the government need only show that the enterprise, not each individual predicate act, affected interstate commerce. *See* 18 U.S.C. § 1962(c) ("It shall be unlawful for any person employed by or associated with *any enterprise engaged in, or the activities of which affect,* interstate or foreign commerce....") (emphasis added). *See also, United States v. Altomare,* 625 F.2d 5, 8 (4th Cir.1980) ("The government need not demonstrate that the alleged acts of racketeering themselves directly involved interstate commerce."). Additionally, the effect on interstate commerce need only be minimal. *See United States v. Doherty,* 867 F.2d 47, 68 (1st Cir.1989) (and cases cited therein); *United States v. Robinson,* 763 F.2d 778, 781 (6th Cir.1985); *United States v. Stratton,* 649 F.2d 1066, 1075 n. 12 (5th Cir.1981); *United States v. Rone,* 598 F.2d 564, 573 (9th Cir.1979).

Cooper and his confederates obtained guns manufactured in other states, and carried those guns across state lines into and out of the District of Columbia. They made interstate telephone calls. They committed crimes against establishments engaged in interstate commerce. They traveled between the District of Columbia, Maryland and Pennsylvania. The group planned activities in the District of Columbia and then traveled from the District of Columbia to Pennsylvania to rob the massage parlor, and from the District of Columbia to Maryland to rob the Pizza Italia, Officer Howard, the Chevy Chase Bank, and the Community Center. After each of these incidents, the group traveled back across state lines to the District of Columbia. It is clear the alleged activities of Cooper's enterprise affected interstate commerce. *See, e.g., Keltner,* 147 F.3d at 669 (interstate commerce requirement satisfied when defendants traveled between several states and committed some of the RICO predicate acts in another state); *United States v. Norton,* 867 F.2d 1354 (11th Cir.1989) (interstate commerce requirement satisfied when group members traveled between states to discuss and carry out RICO conspiracy).

Second, Cooper argues no enterprise was in existence in 1993. However, every enterprise begins somewhere. There is no requirement that an enterprise be in existence before the first predicate act is committed as long as that first act relates to and is continuous with the subsequent acts in the pattern. *See H.J., Inc.,* 492 U.S. at 239, 109 S.Ct. 2893 (holding that racketeering predicates must be related and "amount to or pose a threat of continued criminal activity"), Cooper's third argument, that the Griffin counts do not satisfy the relatedness and continuity elements, requires more discussion.

### 1. Relatedness

Relatedness is construed broadly: "criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240, 109 S.Ct. 2893 (quoting repealed 18 U.S.C. § 3575(e)).[14] *See also, United States v. Blandford,* 33 F.3d 685 (6th Cir.1994) ("The Supreme Court's use of the disjunctive suggests that the Court meant to craft a broad test of relatedness."). The relatedness requirement is especially easy to meet with crimi-

ed, but the government indicates it occurred after the Griffin murder), and Cooper and James are alleged to have committed a robbery and shooting in 1995.

14. The Supreme Court found instructive Congress' definition of the term "pattern" as stated in the Dangerous Special Offender provision in 18 U.S.C. § 3575(e), repealed by the Sentencing Reform Act of 1984. The Supreme Court adopted that statutory definition of "pattern" and applied it to the RICO requirement of a pattern of racketeering activity.

nal enterprises. As the Seventh Circuit noted, "the business of a criminal enterprise is crime . . . a criminal enterprise is more, not less, dangerous if it is versatile, flexible, diverse in its objectives and capabilities . . . [these characteristics] are not inconsistent with pattern." *Masters*, 924 F.2d at 1366 (7th Cir.1991).[15]

*Keltner* is once again illustrative. The group in *Keltner* started out by stealing a car and ramming it into a Radio Shack store for the purpose of breaking into the store and stealing microphones, walkie-talkies and other equipment. The group then committed several robberies and kidnaping over a period of a few months. They initially burglarized homes, and then kidnaped a bank president on his way to work, forcing him to drive to the bank and obtain one million dollars. In holding that the ten predicate acts in question were related to the pattern, the Court held

> Several of the items taken by defendants during the robberies were used in subsequent robberies and the Tulsa bank robbery, including microphones, walkie-talkies, firearms, a police scanner and a police scanner guide. . . . Several of the defendants' victims testified that Nabors was the individual in charge and directed the activities of the other individuals during the commission of such crimes. The defendants' criminal activity progressed from burglary of unoccupied structures, to robberies of owner-occupied homes, to kidnaping, to attempting to extort $1 million from a bank. Defendants' progressing criminal activity became more complex, requiring signifi-

cant planning to avoid detection by law enforcement.

*Keltner*, 147 F.3d at 669.

Here, the enterprise started out with Cooper and Earnest robbing Sandy Griffin to obtain Griffin's gun for Earnest to use in future crimes. The group then proceeded to commit numerous other charged and uncharged robberies, murders and shootings over the next four years, with Earnest participating in the vast majority of those incidents. With respect to the Griffin robbery and murder, Cooper encountered an opportunity, took the lead and went inside while Earnest stayed behind. This behavior is very similar to the attempted robbery and shooting of Officer Howard (Cooper noticed the officer and a woman in a car and decided to rob them while Earnest and another man stayed behind), the uncharged robbery of the necklace (Cooper drove by and decided to rob a man while Earnest stayed behind) and the uncharged robbery and shooting of the individual who was inside the stolen car on Blandensburg Road (Cooper and James saw a man in their stolen truck, Cooper instructed James to take the man's money, and when the man ran away, Cooper shot at him). Moreover, Cooper allegedly stole Griffin's gun. In at least one other instance—the robbery of the Velvet Touch Massage Parlor—the group is alleged to have stolen a gun. In addition to Sandy Griffin, Cooper is alleged to have shot or killed five other individuals—three in the Starbucks incident, Officer Howard, and the man in the uncharged robbery on Blandensburg Road—because Cooper became scared or

---

**15.** In *Masters,* the criminal enterprise consisted of a bribery kickback scheme involving Masters, a lawyer, Masters' law firm, two police officers and their respective police departments. In one scheme, Masters bribed the chief of police to refer persons arrested, ticketed, or investigated to him for legal assistance. In another scheme, illegal bookmakers would use *Masters* as a middleman to bribe police officers to leave them alone. The first scheme continued from 1970 until 1982; the second from 1972 until 1984. In 1981, Masters discovered his wife was having an affair and Masters and the police officers acted in concert to hire someone to murder Masters' wife, hide the body, and thwart the investigation of the murder. The Court held that the charges in connection with the murder were part of a pattern of racketeering activity. The Court noted the "systematic corruption of law enforcement in the west Chicago suburbs brought about by the Masters enterprise could be used for a variety of purposes without destroying the integrity, the rationale, of the enterprise." *Id.* at 1367.

the victim would not cooperate.[16] Cooper allegedly wore a mask when he robbed Griffin, as he did in the Pizza Italia and Velvet Touch robberies. Clearly, the robbery method used on Sandy Griffin was consistent with the group's "regular way of conducting or participating in the conduct of the alleged and ongoing RICO enterprise" *See H.J., Inc.*, 492 U.S. at 250, 109 S.Ct. 2893.

## 2. *Continuity*

█ Continuity is both a close-ended and an open-ended concept. Cooper's alleged criminal activity falls within both. Continuity can be established under a close-ended analysis if the past criminal conduct "extend[s] over a substantial period of time," *H.J., Inc.*, 492 U.S. at 242, 109 S.Ct. 2893. The Supreme Court did not define "substantial period of time," but indicated that conduct occurring over a period of a "few weeks or months and threatening no future conduct" would not satisfy the continuity requirement. *See id.* The federal courts have found close-ended continuity to exist where predicate offenses occurred over a period of time ranging from fourteen months to more than three years. *See* Jimmy Gurule, *Complex Criminal Litigation* (1996), § 2–2(d)(2) at 82–83 (citing cases). Cooper's alleged crimes took place over a period of time exceeding four years. This clearly falls within the "substantial period of time" envisioned by the Supreme Court. *See Tabas v. Tabas*, 47 F.3d 1280, 1294 (3rd Cir.1995) ("We conclude that a scheme lasting over three years extends over a "substantial" period of time and therefore

constitutes the type of "long-term criminal conduct" that RICO was enacted to address."); *United States v. Dischner*, 974 F.2d 1502, 1510 (9th Cir.1992) (predicate acts involving public corruption, bribery and kickback schemes occurring over a three-year period constituted "substantial period of time").

█ The predicate acts allegedly committed by Cooper's enterprise can also be considered under an open-ended analysis. If the predicate acts do not meet the "substantial period of time" standard for close-ended continuity, the government can still prove continuity by demonstrating open-ended conduct, *i.e.*, that the "related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit." *H.J., Inc.*, 492 U.S. at 242, 109 S.Ct. 2893. The threat of long-term activity must be demonstrated by "far more than a hypothetical possibility." *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1264 (D.C.Cir.1995) (citing *Pyramid Securities Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1119 (D.C.Cir.1991)).

█ Cooper's enterprise was formed for the purpose of committing robberies. It started with the robbery and murder of Sandy Griffin and continued to exist until it was hampered by law enforcement efforts. According to the government, Cooper and his circle of friends would have continued their crime spree had they not been caught. *Richardson* is illustrative on this point:

> The fortuitous interruption of [racketeering] activity such as by an arrest

---

**16.** Cooper argues the Griffin murder and robbery should not be part of the pattern of racketeering activity because "except for the killing of Sandy Griffin and the Starbucks robbery and killing, no one was hurt. This sets the killing of Sandy Griffin apart from the robberies, which are different in goal as well as method." Mot. to Dismiss at 4. This argument is unavailing. First, Cooper was also charged with the shooting of Bruce Howard on August 12, 1996, and is alleged to have participated in the uncharged shooting in

1995. Second, there is evidence that the enterprise was violent. In the robbery of the massage parlor, James is purported to have placed the barrel of his gun in the vagina of one of the victims. Moreover, there were repeated threats made to harm both informers and law enforcement officers. There is always the threat of harm in any crime involving loaded weapons. It is frivolous to suggest that the several robberies are not related in method because some resulted in shootings (or death) while others did not.

does not grant defendants a free pass to evade RICO charges. As the district court observed, the sheer number of serious crimes, which victimized dozens of persons and led to five deaths ... made the threat of future criminality palpable. *Richardson,* 167 F.3d at 625 (internal citations and quotations omitted). *See also, Keltner,* 147 F.3d at 669 (defendant's criminal activities consisting of burglaries, kidnaping and extortion involved the "distinct threat of long-term racketeering activity"); *United States v. To,* 144 F.3d 737 (11th Cir.1998) ("Because the enterprise continued to exist and continued [targeting Asian–American restauranteurs for robberies], a reasonable juror could conclude that the threat of continuing racketeering activity was present in this case.").[17]

Continuity or the threat of continued activity is clearly present here. According to the government, over the course of more than four years, Cooper and his confederates consistently and methodically committed at least eight robberies, and planned at least five others that never came to fruition. In addition, the group "victimized approximately twenty different individuals, murdering four people, wounding two and assaulting several others." Govt. Omnibus Opp. at 51–52. Moreover, the group showed no intention to terminate their actions. Given all of the above, the group was, and would have remained, a continued threat to the public by virtue of their criminal activities.

### C. Counts Pertaining to Starbucks Murders

Cooper argues (1) the acts alleged in the indictment concerning the Starbucks murders are not part of the pattern of racketeering activity because they were committed during an isolated event not related to the other predicate crimes of the enterprise, and (2) the Starbucks counts should be severed from the indictment because Cooper will be prejudiced by their inclusion.

### 1. Pattern of Racketeering Activity

■■ Cooper argues the government's evidence on the Starbucks counts differs in many respects from evidence of the other crimes allegedly committed by the enterprise: (1) Cooper did not wear a mask, try to hide his identity, or otherwise take elaborate steps to avoid detection; (2) Cooper acted alone; (3) Cooper shot two witnesses who did not try to resist, when in the past he only shot those who did try to resist; (4) there was no warning shot fired during the other crimes; (5) there was no getaway driver to implement the usual quick and efficient escape; (6) there was nothing stolen and no proof that Cooper intended to divide up the proceeds, had there been any, with the other members.

On the contrary, the Starbucks attempted robbery and murders are directly related to the pattern of activity. Although Cooper is alleged to have gone into the Starbucks alone, the government's evidence is that Cooper planned the robbery with Earnest and it was only because Cooper was unable to locate Earnest on the day in question that he committed the crime on his own. Cooper and Earnest allegedly planned numerous other robberies together, at least three of which, like Starbucks, involved Cooper and Earnest alone.

The government's proffer also shows that the enterprise, with Cooper's lead,

---

**17.** Cooper argues that the three-year lapse between the Griffin murder and robbery and the other charged acts defeats the continuity of the pattern. Cooper's argument fails for two reasons. First, there were uncharged acts committed in the interim period between the Griffin incident and the next charged predicate act that may be considered as evidence of the pattern. Second, aside from the statutory requirement that at least two predicate acts occur within a ten-year period, there is no limit on the amount of time that can lapse between two predicate incidents. In *United States v. Wong,* 40 F.3d 1347, 1374–1375 (2d Cir.1994), the Second Circuit upheld a finding of a RICO pattern of activity on three predicate acts occurring in February 1987, January 1990 and August 1990.

engaged in methods to avoid detection. For example, Cooper drove by the laundromat to check out the security situation. He took a videotape from the security camera at the massage parlor, and he rejected robberies at the tire shop and hair salon because of cameras and police cars in the vicinity. Similar to measures taken in these instances, Cooper drove by the Starbucks earlier on the day of the murders to check out the scene.

As in the other criminal acts, Cooper allegedly used a gun and went inside with the intent to rob the Starbucks. His plans were thwarted when the manager refused to turn over the keys to the safe. Cooper allegedly shoots his victims when he perceives them to be a threat or if they are not cooperating. This happened at Starbucks as well as in the incidents involving Sandy Griffin, Bruce Howard, and the uncharged robbery and shooting on Bladensburg Road. Cooper's attempts to distinguish Starbucks on the basis that no mask was worn, or that a warning shot was fired, or that more than one victim was killed, are unavailing. The requirements for establishing relatedness to a pattern of racketeering activity are simply not that rigid.

## 2. Severance

■ Joinder of charges is permitted in an indictment if the charges arise from "transactions connected together or constituting part of a common scheme or plan." Fed.R.Crim.P. 8(a). Joinder of predicate offenses constituting a pattern of racketeering activity is generally considered proper. *See Richardson,* 167 F.3d at 624 ("In this case, the RICO and RICO conspiracy counts functioned as the "connective tissue," as the district court put it, that allowed joinder of all fifteen incidents and all three defendants in a single trial."); *United States v. Gorny,* 732 F.2d 597, 603 (7th Cir.1984) ("The Stanger counts formed additional underlying predicate of-

fenses constituting the pattern of bribery in the racketeering count, and the joinder of such counts is generally held to be proper.").

Cooper argues that "[a]s soon as a prospective jury learns that a part of the case relates to the highly publicized Starbucks charges, a risk occurs that they will immediately conclude that Cooper is such a bad person that he must have necessarily committed the other offenses." Mot. to Sever at 2.

■ While this Court has discretion to sever properly joined charges upon a finding of prejudice, *see* Fed.R.Crim.P. 14 ("If it appears that a defendant or the government is prejudiced by a joinder of offenses ... the court may order an election of separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires."), this Court is convinced that a jury would be able to separate the evidence on the Starbucks counts from the evidence on the other charges. There is some level of prejudice in all high profile cases, and Cooper has alleged nothing except the high profile status of the case to support his position that he will be prejudiced if the jury is permitted to consider the Starbucks evidence with evidence of the other indicted crimes. The evidence as to each crime, including the Starbucks counts, is not so complicated that the jury will be unable to distinguish among them. "With a proper charge, the jury can easily keep such evidence separate in their deliberations and, therefore, the danger of the jury's cumulating the evidence is substantially reduced." *Drew v. United States,* 331 F.2d 85, 89 (D.C.Cir.1964). There is always the possibility that the jury will misuse the evidence, especially in a high profile case, but there is nothing in this case "beyond the type and degree of prejudice customary in virtually all high-profile trials." *United States v. Boylan,* 898 F.2d 230, 246 (1st Cir.1990). Cooper's motion to sever is denied.[18]

---

**18.** To the extent Cooper argues he will be

prejudiced by the inclusion of the Sandy Grif-

**D. Motion for Pretrial Hearing to Determine the Existence of a Conspiracy and to Determine the Admissibility of Co–Conspirators Statements**

 Cooper has filed a motion for a pretrial determination as to whether a conspiracy existed and as to whether the co-conspirator statements are admissible under Fed.R.Evid. 801(d)(2)(E).[19] The government has opposed the motion, stating the Court should admit the co-conspirators statements during trial "subject to connection" as opposed to holding a disfavored "mini-trial" of the evidence. The government has offered a significant proffer of anticipated evidence describing the RICO enterprise and RICO conspiracy.

The Court declines to conduct a pre-trial hearing. Instead, as is common practice in this Circuit, and completely appropriate here, the Court will admit declarations of co-conspirators subject to connection. "If substantial evidence of the connection has not been produced at the close of the government's case the court will instruct the jury to disregard the hearsay statements." *United States v. Gantt,* 617 F.2d 831, 845 (D.C.Cir.1980). *See also United States v. Jackson,* 627 F.2d 1198, 1218 (D.C.Cir.1980).

**E. Motion for In Camera Review of Grand Jury Testimony to Determine the Existence of a Racketeering Enterprise**

Cooper claims there is insufficient evidence to establish a racketeering enterprise. He asks the Court to conduct an in camera review of grand jury testimony to assist the Court in reaching a determination as to whether an enterprise exists. However, the Court is satisfied with both the government's proffer of evidence, and the evidence presented so far in the case,

and an in camera review of the grand jury transcripts is unnecessary. Cooper's motion is therefore denied.

### III. Conclusion

For the reasons stated, it is hereby

ORDERED that defendant's Motion to Dismiss Indictment for Failure to Allege RICO Enterprise Sufficiently Distinct From the Predicate Acts is hereby denied; it is

FURTHER ORDERED that defendant's Motion to Dismiss Counts Three and Four in the Indictment and to Strike Racketeering Act One of Count One and to Strike All References to the Murder of Sandy Griffin in Count Two of the Indictment is hereby denied; it is

FURTHER ORDERED that defendant's Motion to Sever All Counts Related to the Starbucks Shootings From the Other Counts in the Indictment is hereby denied; it is

FURTHER ORDERED that defendant's Motion for Pretrial Hearing to Determine the Existence of a Conspiracy and to Determine the Admissibility of Co–Conspirators Statements is hereby denied; it is

FURTHER ORDERED that defendant's Motion for In Camera Review of Grand Jury Testimony to Determine the Existence of a Racketeering Enterprise is denied.

IT IS SO ORDERED.

in counts in the indictment, the Court's reasoning applies to this argument as well.

**19.** Rule 801(d)(2)(E) permits the introduction of statements by an alleged co-conspirator provided there is evidence independent of the statements to show that (1) a conspiracy existed, (2) the declarant and the co-defendant were members of the conspiracy, and (3) the statements were made in furtherance of the conspiracy.